## BROWNE *against* MOLLISTON.

### IN ERROR.

1. On the trial of an issue to determine the validity of a will, one of the subscribing witnesses having proved its execution, testified, on the cross-examination, that he heard of there having been a former will: *Held*, that he could not be asked, on such cross-examination, whether he had ever heard the plaintiff say what had become of that former will, and whether it was destroyed.

2. On the trial of the same issue, a witness was called by the defendant, and asked if he was present at any conversation between the plaintiff, the principal devisees under the will, and the testator, about the disposition of his property, and what that conversation was: *Held*, that the question was properly overruled: not being connected with the testamentary disposition then in issue.

3. On the trial of such issue, evidence is not admissible to prove the contents of a former will, unless notice has been given to produce such former will, or some evidence be given or offered, to show that it has been destroyed: And it was *held*, that a witness could not be asked if the plaintiff ever told him what had become of such former will.

4. Where the validity of an alleged will is contested on the grounds of imbecility of mind and undue influence on the testator, it is not error to charge the jury, that "facts and circumstances were the primary evidence on which they must rely, and not the opinion of witnesses as to the soundness or capacity to make a will;" nor is it error to charge in such case that "the influence exercised in procuring a will which is sufficient to set it aside, must be such as destroys free agency. There must be imprisonment of the body or mind; and that unless the jury were satisfied that there was such physical force exerted, arising from actual duress, or imprisonment of the body, or such mental force, arising from threats, as prevented free agency, they were not to consider the influence exerted by the testator's daughter as improper, or sufficient to invalidate the will.

5. It is not error, that the Court below allowed a party to recall a witness and ask him a question which might have been asked at a former stage of the cause; unless, perhaps, the witnesses of the other party as to the point had been dismissed, after the testimony in chief was closed.

THIS was a writ of error to the Court of Common Pleas for the City and County of Philadelphia, to remove the record of the proceedings on a feigned issue, which had been directed by the register of wills for the said city and county.

The precept of the register recited, that a certain Nancy Molliston, on a certain day in the year 1835, presented to the then [*130] register *for probate a certain writing thereunto annexed, purporting to have been made on the 4th day of November, A. D. 1833, with the name or mark of Lunar Brown subscribed, &c.: and also recited that Robert Browne, who is a son and heir of the said deceased, had objected that the said writing was procured by duress and constraint, viz.:

(Browne v. Molliston.)

"1st. That the said Lunar Browne, at the time that the said will is alleged to have been made by him, was of infirm and unsound mind, and incapable of making any will.

2nd. That the said testamentary writing was not read to, nor the terms of it made known to the said Lunar Browne at the time the said testamentary writing was signed, nor at any time previous thereto; and that at the time it was signed he could not read, and did not know the terms or purport of what the said writing contained.

3d. For that the said testamentary writing is not signed by said Lunar Browne, nor was it declared and published as his last will and testament at the time it bears date, or at any time since."

The alleged will was as follows:

"I, Lunar Browne, of the Northern Liberties, and the county of Philadelphia and state of Pennsylvania, sweepmaster, &c.

Item. I do give and bequeath to my son Robert Browne, my clock and desk, also a pair of steelyards. Item. I give and bequeath all the residue of my household goods, furniture, and kitchen utensils unto my three grand-daughters, viz. Phillis Smith, Sarah Newman, and Maria Colwell, equally to be divided between them. Item. I give and bequeath to my daughter Nancy Molliston the use and occupation of my five frame messuages or tenements and lot or piece of ground, situate on the north side of Brown street, at the distance of one hundred and fifteen feet eight inches, or thereabouts, from the corner of the said Brown street and north Fourth street, in the Northern Liberties aforesaid, containing in front or breadth east and west forty feet, and in length or depth, northward, on the west line, one hundred and eighteen feet ten inches, and on the east line, one hundred and twenty-three feet four and a half inches, together with the appurtenances, for, and during the term of her natural life: to take and receive the rents, issues and profits thereof, for her sole and separate use during the said term. And from and immediately after her decease, I give and devise the said five messuages or tenements and lot or piece of ground, hereinbefore particularly described, together with the buildings, improvements, and appurtenances as follows, to wit, one full equal and undivided moiety or half part thereof, I give and devise unto my said son Robert Browne, his heirs and assigns forever; the remaining one, full, equal undivided moiety or half part thereof, I give and devise to my four grandchildren, [*131] *namely, Sarah Newman, Phillis Smith, Robert Colwell and Maria Colwell, in equal shares, as tenants in common, and to their heirs and assigns forever. And in case any street should be opened through the said lot or piece of ground, my will is that

(Browne *v.* Molliston.)

the moneys subscribed on account of damages sustained thereby, shall be applied by my executor to the improvement of the said premises and repairing of the buildings which may be injured by opening of the said street through the same. And as touching all the rest, residue, and remainder of my personal estate, my will is, that the same be applied to the repairs of said premises by my said executor, as soon as shall be reasonably convenient after my decease.

And lastly, I nominate, constitute and appoint my said son Robert Browne, to be the executor of this my last will and testament, &c. &c.

4th Nov. 1833.                    LUNAR $\overset{\text{his}}{\times}$ BROWNE.
                                       mark.

ABRAHAM LUKENS, } Witnesses."
JOSHUA STACKHOUS, }

On the trial, before Judge Jones, the plaintiff's counsel gave the will in evidence, and called John H. Cavender as a witness, who testified, *inter alia*, that he had drawn the said will; and also Abraham Lukens, one of the subscribing witnesses to the testamentary writing, who testified to its execution by Lunar Browne. Being cross-examined, the last witness testified as follows: "I know nothing at all about his (Lunar Browne) being able to read, nor of his having made a will before. When the will was executed, it was said at the time, this is to do the other away. I don't know what other; I suppose by his (Lunar Browne) saying that, there was another. I have heard both the daughter, Ann Molliston, and son, say there had been another will. I never heard her say this will had been drawn from the other." The defendant's counsel then asked the witness whether he had ever heard the plaintiff say what had become of the former will, and whether it was destroyed? to which question the plaintiff's counsel objected, as being a leading question as to a fact, not drawn out in the main examination. The question was then overruled by the Court, and excepted to. The counsel for the defendant then offered James Berry as a witness, who being sworn, testified, *inter alia*, that five or six months before the date of a certain settlement which was then produced, and bore date the 24th day of December, A. D. 1824, the witness heard Lunar Browne say to Ann Molliston, "This house, in which I am in myself, I wish Robert to have—this house, and this lot back, and that house in which witness lived, close to his," (Lunar Browne's). The defendant's counsel then offered Samuel Underwood as a witness, who, being sworn, was asked whether he was present at any conversation between Ann Molliston, the plaintiff, and her

(Browne *v.* Molliston.)

father, about the disposition of his *property, and what [*132]
that conversation was? This question being objected to,
the Court overruled it, as not being previously connected with
the present testamentary disposition; to which the defendant's
counsel excepted. The witness then deposed, that he went with
the plaintiff to Mr. Kline, in whose custody it was, for the first
will of Lunar Browne (spoken of above as "the other;") that
she got it from Mr. Kline, and took it home. Witness was then
asked what the plaintiff said in regard to the will which she
brought from Mr. Kline, but the question was overruled by the
Court; to which the defendant excepted. The witness was then
asked if the plaintiff ever told him what became of the former
will; this question was also overruled, and exception taken.
William O. Kline was then offered as a witness by the defendant's
counsel. The witness having testified to the fact of his having
drawn the former will of Lunar Browne, and having given it to
Ann Molliston, was asked "What were the contents of that will?"
This question the Court overruled; to which the defendant ex-
cepted. The defendant's counsel then offered Richard Russell
as a witness, who, being sworn, was asked if he knew of any dis-
pute between the plaintiff and Ann Tolbert, (a daughter of the
deceased daughter of Lunar Browne, and not included in his last
will,) prior to the date of said will? The question being objected
to, the Court overruled it; and an exception was taken. Evi-
dence was also given by the defendant of the great old age and
imbecility of Lunar Browne, at the time of the execution of the
said will. The plaintiff's counsel then offered John H. Cavender
as a witness, and asked him from whom it was he received the in-
structions to draw the will; which question was objected to by
the defendant's counsel, but the objection was overruled by the
Court, and an exception taken, and the witness then testified *in-
ter alia* as follows: "I did not receive instructions from any per-
son but Lunar Browne; but in one instance (at the time Lunar
Browne was giving me the instructions,) she, Ann Molliston, cor-
rected my mention of a name." The witness also testified that
he drew out the will from the notes taken by him, according to
the instructions of Lunar Browne.

After the testimony on both sides was closed, the Court charged
the jury, that the decedent must be presumed to have been of a
competent mind to make a will, until the contrary is shown; and
that the presumption of competency is not destroyed by any ex-
tremity of old age, though that presumption may be weakened
when the decedent is very old: that it matters not that the de-
cedent may have been one hundred years old, more or less, at the
time of the execution of the will; that facts and circumstances
are the primary evidence, and not the opinions of witnesses as

(Browne *v.* Molliston.)

to the soundness of a man's mind, or his competency to make a will; that it is the opinion of the jury, founded on the facts and [*133] circumstances, and not that of *witnesses, that is to decide as to the soundness or unsoundness of a man's mind; that the will being given in evidence, its internal evidence may be considered; that the reasonableness of the bequests may be part of the chain of evidence, and may corroborate other facts and circumstances to show the soundness of a man's mind, though there is no instance in the law of a will being invalidated by its own unreasonableness alone; and further, that the law is well settled, that the influence exercised (in procuring a will) which sets aside a will, must be such as destroys free agency: there must be imprisonment of the body, or mind; and that unless the jury are satisfied that there was such physical force exerted, arising from actual duress or imprisonment of the body, or such mental force arising from threats, as prevented free agency, they were not to consider the influence exerted by Ann Molliston as improper: that the fact of Ann Molliston's having sent to the person in whose possession it was, for an old will of Lunar Browne, had no other bearing in this case, than as a link in the chain of evidence to show improper influence.

The defendant's counsel excepted to this charge; and the jury having found in favour of the will, the record was removed to this Court, and the following errors assigned.

" 1. The Court below erred in deciding that Abraham Lukens, a witness produced by the plaintiff below, should not be permitted to answer the question, in behalf of the defendant below, "whether he had ever heard the plaintiff say what had become of the former will of Lunar Browne, and whether it was destroyed."

2d. The Court below further erred in refusing to allow Samuel Underwood, a witness for the defendant, to answer the question put by defendant's counsel, "whether he was present at any conversation between Ann Molliston, the plaintiff, and her father, about the disposition of his property, and what that conversation was;" and in overruling the said question.

3rd. The Court below also erred in not permitting the same witness to testify as to what the plaintiff below said in regard to the will brought from Mr. Kline.

4th. And the Court also erred in refusing to permit the same witness to answer the question, " whether the plaintiff ever told the witness what became of the said will."

5th. The Court below also erred in not permitting William O. Kline to state what were the contents of the former will of Lunar

(Browne v. Molliston.)

Browne, which said will was traced unto the hands of the plaintiff, and not produced by her.

6th. The Court further erred in not permitting Richard Russell a *witness for the defendant, to state whether he knew of any dispute, prior to the date of the alleged last will, between the plaintiff and Ann Tolbert, the daughter of the deceased daughter of Lunar Browne, and not included in his alleged last will.  [*134]

7th. The Court further erred in permitting John H. Cavender, a witness produced by plaintiff, to state upon the re-examination, after the defendant had closed, from whom it was he had received the instructions to draw the will of Lunar Browne.

8th. The Court erred in charging the jury, that very little regard was to be paid to the opinion of witnesses, as to the competency of a testator to make a will, or as to the unsoundness of his mind.

9th. The Court erred in charging the jury, that the influence exercised in procuring a will, which is sufficient to set aside a will, must be such as destroys free agency; there must be imprisonment of body or mind; and unless the jury are satisfied there was such physical force exerted arising from actual duress or imprisonment of the body—or such mental force arising from threats, as prevented free agency—the jury were not to consider the influence exerted by the plaintiff below as improper.

10th. That the charge of the Court should have been for the defendant below."

Mr. Fallon, and Mr. D. P. Brown, for the plaintiff in error, cited Irish v. Smith, (8 Serg. & Rawle, 571); Dornick v. Reickenbach, (10 Serg. & Rawle, 84); 1 Story's Equity, 241-2.

Mr. St. G. Campbell, contra, cited Miller v. Miller, (3 Serg. & Rawle, 267); Lightner v. Wike, (4 Serg. & Rawle, 203); Bovard v. Wallace, (Id. 499); Nussear v. Arnold, (13 Serg. & Rawle, 323); Dietrich v. Dietrich, (1 Penn. Rep. 306); Spence v. Spence, (4 Watts, 167); Stevens v. Vancleve, (4 Wash. C. C. Rep. 265); Whitaker v. Tatham, (7 Bing. 628; s. c. 20 Eng. Com. Law Reps. 268); Kindleside v. Harrison, (2 Phill. Eccles. Rep. 456); Evans v. Knight, (1 Addams's Eccles. Rep. 239).

The opinion of the Court was delivered by

Huston, J.—This case arose on a dispute in the Register's

(Browne *v.* Molliston.)

Court, to try whether a certain paper writing was the last will and testament of Lunar Browne, deceased.

The paper book submitted to us is exceedingly brief, or rather the account contained in it of what occurred in the Court below, is very brief, in some respects unsatisfactory, and in some, (as appeared by inspecting the record,) defective. Perhaps there is no class of cases in which so much testimony is given, which ought to have no weight with a jury, as in cases on wills, in which the allegation is *that the testator was insane; or in legal [*135] phrase, not of sound and disposing mind and memory. How far age or sickness, acute, or long continued, does actually affect the mind, is not known; or not so well known, as to be reduced to any rule. Or what effect any of those disorders which sometimes peculiarly affect the mind, as paralysis, has produced in the particular case, is not easily settled. I remember a case in the Circuit Court, in this city, in which somewhere between ten and twenty medical men of the highest standing in the city and county, were examined; and some proved that in all cases of paralysis the mind was affected to some extent; others, that in many cases it was not at all affected, &c., &c.

Something like this often occurs, when the effect of old age is the subject of inquiry. And certainly nothing can be collected from the number of years which have elapsed since a man's birth. In some, the body and mind seem worn out at three score and ten or before it; in others, both body and mind are capable of much, and energetic action, for years after four score. We know not the age of the testator in this case; he was a coloured man and illiterate; no record was made, or none preserved of his birth; it seems agreed he was four score or upwards.

The exceptions are to the opinion of the Court on certain questions put by the counsel to several witnesses; and to the charge of the Court.

The plaintiff below, (here defendant,) called J. H. Cavender who drew the will; we have nothing of his testimony in this part of the paper book. Then he called A. Lukens, one of the witnesses to the will, who proved its execution, and then said, "I know nothing about his, Lunar Browne's, being able to read, nor of his having made a will before. When this will was executed, he said this is to do away the other. I suppose by his saying that, there was another. I have heard both the daughter and the son say, there had been another will. I never heard her say this will had been drawn from the other." Defendant's counsel then asked the witness whether he had ever heard the plaintiff, Ann Molliston, say, what had become of the former will, and whether it was destroyed. This was objected to, as being a leading question, not to any cross-examination on the subject of

(Browne v. Molliston.)

the testimony in chief, but to a fact which might occur as part of the defendant's case.   The Court overruled the testimony.

Certainly this was not a cross-examination, for it had no connection with the execution of the will.   We are told here, that the defendant below alleged that the will in question was procured by duress or undue influence, or in some other illegal way by Ann Molliston.   But when this question was put, the defendant had not opened his case.   The Court would know nothing of it.   It is irregular to introduce in the way attempted here, the ground on which the defendant intends to rely.   The Court cannot know whether it is or *will be material; and it was not error to reject it at that stage of the cause: we shall have to   [*136] notice it in another shape hereafter.

The next exception is as follows:   S. Underwood was called by the defendant, and asked whether he was present at any conversation between the testator and Ann Molliston, as to the disposition of his property, and what that conversation was ?   This was objected to; and rejected as not being connected with the present testamentary disposition.   Although the paper book don't expressly say so, the defendant must have admitted it had no relation to the last disposition of his estate.   A man may change his mind as to the disposition of his property; and may change his will at any time as long as he lives.   It would be idle, useless, and immaterial, to prove what a man said many years ago on this subject, or one year ago, unless something else is adduced, to impugn the will of last week.   If it were not so, the law requiring a written will, is worse than useless.   It would go for nothing as often as witnesses could be found to prove that the testator once said he would make a different disposition of his estate. The witness then stated, that he went with Ann Molliston to Mr. Kline, who had the former will; that she got it and took it home. (She was the daughter of the testator, and used to live with him.) Witness was then asked what the plaintiff said in regard to that will which she got from Mr. Kline; this was objected to and overruled.   Witness was then asked if the plaintiff ever told him what became of that former will—this also was objected to and overruled. Mr. Kline was then called, and proved that he wrote the former will, and gave it to the plaintiff.   And he was then asked what were the contents of that will ?—which was objected to and overruled.   Exceptions were taken in each of these cases, and they were argued together; it being understood, that the object of them all was to get in parol proof of the contents of the former will.   And first, no notice had been given to produce it; and without this, you cannot give parol evidence of the contents of a paper.   It was replied, that one of the questions went to prove that Ann Molliston said it was destroyed, but the question will

(Browne *v.* Molliston.)

hardly bear that construction. "What Ann Molliston told him had become of that former will"? The answer that she said it was destroyed, is not necessarily to be supposed; and it is as probable some other answer would have been given. But suppose the witness had testified that she said it was lost or torn; would that dispense with a notice to produce it? I doubt this. If the witness had seen it burnt, or torn and scattered, a notice to produce might be useless. But many a lost paper has been found; and many a paper supposed to be destroyed, is found still in existence. We need not settle this matter. If a direct offer had been made to prove she had said it was destroyed, we do not know that it would have been rejected. If such was the expectation from the question, it is not easy to see why a plain question on that subject was not put.

[*137]     *But if it was destroyed, the proof was, that at executing the present will, the testator said, it was to do the other away; and unless there was proof of incapacity of the testator to make the present will, or fraud or misrepresentation in procuring it, how could the existence or destruction, or the contents of the former will, be material? If there was no evidence, and we see none in our paper book, of mental imbecility, or fraud, or misrepresentation, or force, the Court must have told the jury, that it was totally immaterial, whether the former will was or was not destroyed; and equally immaterial, what were its contents.

The next bill of exceptions was passed over. The last was this:—The witness who had written the will was called again after the defendants had closed, and asked, who gave him instructions to write the will; this was objected to and admitted. And he answered : "I did not receive instruction of any person but Lunar Browne; but in one instance while he was giving the instructions, she, Ann Molliston, corrected *my* mention of a name. I drew the will from those instructions."

To be sure, this might have been asked at the first examination in chief; but it would not be so necessary until some evidence to some allegation had been made against the will; after such, it was as to such evidence or allegation strictly rebutting; and indeed it would be a singular case in which we would reverse, because a party who had omitted to ask a question at the most proper moment, called back a witness and asked what might have been told before. It must be a case in which some new witness is called to prove some new fact of which the other party was not apprised, or where the witness of the other party as to that point had been dismissed, after the testimony in chief was closed.

The next error assigned is to the charge of the Court. By some

(Browne *v.* Molliston.)

inadvertence, the words given as the charge of the Court, are only part of a sentence, and not even the correct substance of what the judge said.

The substance of the charge on this point, as we find it by recurring to the record is, "That the decedent must be presumed to be competent to make a will, until the contrary is proved. That the presumption of competency is not destroyed by any extremity of age, though it may be weakened, where the testator is very old, and circumstances additional are proved; but taken alone, it matters not that the testator was a hundred years old at the time of executing the will. That facts and circumstances are the primary evidence on which a jury must rely, and not the opinion of witnesses as to the soundness of mind, or capacity to make a will. That it is the opinion of the jury, founded on facts and circumstances proved, and not the opinions of witnesses, which is to decide the case." Now, in this there is no error.

The next error is assigned in the judge stating to the jury, "That *the influence exercised in procuring a will, which is sufficient to set it aside, must be such as de- [*138] stroys free agency. There must be imprisonment of the body or mind. And that unless the jury are satisfied that there was such physical force exerted, arising from actual duress or imprisonment of the body, or such mental force arising from threats, as prevented free agency, they were not to consider the influence exerted by Ann Molliston as improper, or sufficient to invalidate the will." The cases cited support this opinion. Besides we have not before us any testimony to show what she did; and we cannot say that a charge is wrong on conjecture as to the facts to which it applied. There is no allegation of fraud or falsehood being used by her; or none to be found in our paper book.

Judgment affirmed.

Cited by Counsel, 4 Wharton, 318; 8 Harris, 330; 11 Id. 118; 5 Wright, 316.
Cited by the Court, 11 Harris, 379.