# Wytheville.

## HARTMAN v. STRICKLER AND WIFE.

### JULY 8th, 1886.

1. APPELLATE COURT—*Devisavit vel non—New trial.*—On motion for new trial of issue, *devisavit vel non,* where the certificate is of the evidence, and not of the facts, the verdict must stand unless, after rejecting all the exceptor's parol evidence, and giving full force and credit to the adverse party's, the decision of the court below shall appear to be wrong. *Lambert* v. *Cooper,* 29 Gratt. 61.

2. WILLS—"*Undue influence.*"—What is "undue influence" depends on the facts of each case; such as, the dispositions made by testator of his property, and his situation, and mental and physical condition when he makes the will. Where influence induced testator to make grossly unequal dispositions of his property, or disregard the ties of blood, without sufficient cause, it may be treated as undue. But where the will accords with testator's affections and previous declarations, and is such as might have been justly expected, that is persuasive evidence of testamentary capacity and freedom.

3. IDEM—*Case at bar.*—When the will of an old man differs from his previously expressed intentions, and is made in favor of those who stand in relations of confidence or dependence towards him, it raises a violent presumption of fraud and undue influence which should be overcome by satisfactory evidence.

4. IDEM—*Idem—Mental unsoundness.*—To apply "undue influence" it is not essential to show mental unsoundness in the testator; nor that undue influence was exerted at the very time the will was executed.

Appeal from decree of circuit court of Roanoke county, rendered October 10, 1884, in a chancery cause wherein John N. Strickler and Lucy B., his wife were complainants, and

Nathaniel B. Hartman was the defendant.   There was an issue of *devisavit vel non* in the cause to determine whether a writing which N. B. Hartman offered as the will of George Hartman, deceased, was the will of the decedent or not. .The jury found that it was not.   N. B. Hartman moved the circuit court to set aside the.verdict and award him a new trial of the issue.   The motion was overruled; and N. B. Hartman obtained an appeal to this court.

At the trial, on the motion of the defendant, the court below gave the jury four instructions, which are as follows:

1st. That every person not of unsound mind, nor a minor under eighteen years of age, nor a married woman, is entitled under the laws to make a will.

2d. That a person who has made a will is of sound mind is presumed, and the burden of proving the contrary rests on him who alleges it.

3d. That fraud and undue influence (which is a species of fraud) must not be presumed, but must be clearly and strictly proved, and the burden of proving it rests on him who alleges it.

4th. That the influence to vitiate a will must amount to force and coercion, destroying free agency.   It must not be the influence of affection and attachment; it must not be the mere desire of gratifying the wishes of another, for that would be a very strong ground in support of a will.   Further, there must be proof .that the will was obtained by this coercion, by importunity, which could not be resisted; that. it was made merely for the sake of peace, so that the motive was tantamount to force and fear; and that, if from the evidence, the jury believe that George Hartman, at the time of making the will in controversy, had sufficient understanding to comprehend the nature of the business and consented freely and vol-

untarily to the special matter about which he was engaged, they shall find for the plaintiff upon the issue joined. ˙

Opinion states the case.

*G. W. and L. C. Hansbrough,* for the appellant.

It is contended that the proceedings in this case to test the validity of George Hartman's will was a proceeding *at law,* and that the verdict of the jury will not be disturbed, on a motion for a new trial, except for reasons upon which a verdict of the jury would be set aside on a similar motion in *a common law action;* and as authority for this position there is cited by the appellee's counsel the case of *Lambert* v. *Cooper,* 29 Gratt. p. 66.

While it may be conceded that in such a trial as in the trial of *all issues out of chancery,* a point must be saved by bill of exceptions, in order to have it reviewed by an appellate court, yet it is not true that this proceeding is wholly a *common law proceeding,* and that to. the application for a new trial of the issue of *devisavit vel non,* there is applicable the rule which pertains to motions for new trials in common law actions, viz: "that the testimony, instead of the facts, being certified, the appellate court will, after rejecting *all* the parol evidence of the exceptor to the opinion of the court below refusing a new trial, consider only the evidence of the adverse party and the documentary evidence of the exceptor." On the contrary, we contend that the rule applicable to the review of decisions of the court below refusing a new trial of the verdict of a jury upon the trial of an issue out of chancery, is the rule applicable to the case of *devisavit vel non.* See *Powell* v. *Manson,* 22 Gratt. See Code 1873, ch. 118, sec. 34, p. 915, where it is said that, where a will has been admitted to probate, a person interested may, within five years, proceed by *bill in equity* to impeach or

establish a will, in which event a jury shall be ordered to ascertain whether any, and if any, how much of what was so offered for probate is the will of the decedent.

There is nothing in this statute to make such a proceeding, a common law proceeding, any more than there is to make the trial of an issue out of chancery a common law proceeding— for that, too, is allowed by statute. See Code 1873, ch. 173, secs. 4 and 5, p. 1118.

Even in *Lambert* v. *Cooper*, this court considered the issue presented to it as to whether or not the verdict of the jury should be set aside, in reference to *all* of the exceptor's parol evidence, which was *not in conflict with* that of the adverse party, and also in reference to all the evidence on both sides. See 29 Gratt. p. 67; see Syllabus, *Webb* v. *Dye*, 18 W. Va. 391, and *Nease* v. *Capehart*, 15 W. Va. 299.

The idea that a motion for a new trial of an issue of *devisavit vel non* is to be decided upon the plan and grounds on which a motion for a new trial of a verdict in a common law action is decided, arose out of the idea that the court, entertaining a bill to set aside the probate of a will, is *a mere probate court*, a law court. *Malone* v. *Hobbs*, 1 Rob. R. 409–10–11.

But the decision of this court in *Connolly* v. *Connolly*, 32 Gratt. 657, explodes that idea, and establishes the fact that such court is a court of equity (as the statute calls it), and that the proceeding is "an equitable one." And, therefore, this proceeding here is "an equitable proceeding."

Appellee's brief denominates this cause "*a chancery cause.*" The bill asks for more than a jury. It prays for an injunction.

The motion for a new trial of the issue of *devisavit vel non* should be governed by the rules which govern the application for a new trial of a verdict upon an ordinary issue out of chancery, viz: "all the testimony on both sides should be consid-

ered." Such a plan is consonant with the principles of equity practice, and conduces to the attainment of the ends of justice, whilst the other plan is technical, arbitrary and well calculated to shut out the truth, and to defeat the administration of justice.

All the testimony on both sides being considered, there can be no particle of doubt as to the fact that the instrument which was admitted to probate in the county court of Roanoke county as the last will and testament of Geo. Hartman, deceased, was his intelligent and voluntary act, and duly executed in accordance with all the formalities prescribed by law. The same is the result where even the testimony of appellant is rejected which is in conflict with that of appellee.

But even if only the evidence of the appellee be considered, where is the proof of undue influence sufficient to vitiate this will? What is undue influence sufficient to vitiate a will? See *Parramore* v. *Taylor*, 11 Gratt. pages 234 to 239, inclusive.

"The influence to vitiate an act must amount to force and coercion, destroying free agency; it must not be the influence of affection and attachment; it must not be the mere desire of gratifying the wishes of another, for that would be a very strong ground in support of a testamentary act; *further, there must be proof that the act was obtained by this coercion*; by importunity that could not be resisted, that it was done merely for sake of peace, so that the motive was tantamount to force and fear." 11 Gratt., p. 239. See extract from Carr, J., in *Boyd* v. *Cook*, 3 Leigh, on page 54.

"The requisitions of the statute must be satisfied, or the will is not valid, but beyond this, the court seldom looks, unless there be *fraud*. That will vitiate a will however strict the compliance with the statute; but that must be *proved*, and in the absence of proof, the court will not imagine that any fraud may possibly have been practised, and act upon that imagina-

tion. Such a course would convert the law, which was meant to be a shield, into a sword, and destroy twenty good and fair wills for one that was fraudulent. Nor ought courts, in their decisions on wills, to be at all influenced by the reflection, that the law has made a just distribution for such as die intestate; that law was never meant to interfere with the right of every man to dispose, at his will and pleasure, of the property which it had been the labor of a life to acquire, a right dear to him, and held sacred wherever civilization has made progress, or law bears the semblance of science."

In *Parramore* v. *Taylor, supra,* the facts are:

(1) Testator had two children, son and daughter.

(2) He made a very unequal distribution of his estate, giving son much the most.

(3) No reason given except his volition.

(4) Son and family lived with testator.

(5) Son was not present when will was written, having been sent out of room.

(6) Scrivener read will to testator.

(7) Will was (when executed) placed in son's hands.

(8) Son showed it to a lawyer, and when advised that residuary clause was not plain, son devised a codicil, making him sole executor, and proposed it to testator, who executed said codicil. Son's connection with codicil was the strongest circumstance against the propriety of son's conduct.

(9) Son told Scrivener: "Father wants you to put in a clause to compel sister to convey her third in 'Poplar Grove.'" When that clause was read, testator objected to it; but afterwards determined to let it remain.

This court held that there was no undue influence in that case.

The facts of case at bar are similar, except that there is absolutely nothing in the record to show that appellant had

the slightest thing to do in influencing the testator in making his will. Courts admire the rule of equality in the distribution of a parent's estate, but the volition of the testator to violate this rule and make an unequal distribution, is an all-sufficient reason with the courts. The violation of this rule, without apparent good cause, may put them on the alert, and cause them to scrutinize the testament and act with greater care. But being satisfied that it is the act of a competent testator, free from the undue influence of another, the courts are bound to give it due effect. See 11 Gratt. page 238.

"A will should not be vacated on the ground of undue influence, unless it was the efficient cause, without which the devise would not have been made. The influence must be a present and controlling motive at the time; and it is not enough to show that the testator had been subjected to a moral pressure at a former period, if the constraint was removed and he was free to follow his own judgment when the will was executed. It is essential to a good testament that the mind of the testator in making it, be free and not moved by fear, fraud, or undue flattery; and therefore, if a man, by occasion of some present fear or violence, or threatening of future evils, do at the same time, or afterwards by the same motive (that is, when acting under that influence), make a testament, it is void. But it must be a present constraint, operating on the mind of the testator in the very act of making the testament. Threats and violence, or any undue influence long past and gone, and *in no way shown to be connected with the testamentary act,* are not evidence to impeach a will." *Huguenin* v. *Baseley,* 2 Lead. Cas. in Eq., pages 1279–80. Undue influence is a species of fraud, and fraud is never presumed; but he that alleges it must prove it strictly and clearly as alleged. *Orebs* v. *Jones,* 79 Va. 381, 384; *Hord's Adm'r* v. *Colbert,* 28 Gratt. 49; 1 Jarman, pp. 69, 133. Declarations of testator are not admissible to prove that

he was unduly influenced. 2 Lead. Cas. in Eq., 1283. The burden of proof is ordinarily on him who alleges undue influence, and he must show why an instrument which has been executed with the forms required by law should be set aside, and testator is presumed to have a sound and disposing mind and memory. 2 Lead. Cas. in Eq., 1280–1.

*Penn & Cocke and S. Griffin*, for the appellees.

LEWIS, P., delivered the opinion of the court.

The bill was filed to impeach a paper writing admitted to probate in the county court of the said county, as the true last will and testament of George Hartman, deceased. The complainants in the bill, the appellees here, are John N. Strickler and Lucy, his wife, the latter being a daughter and one of the heirs-at-law of the decedent. The bill charges, in general terms, that the paper writing, so admitted to probate, is not the will of the decedent, and prays that an issue *devisavit vel non* be made up and tried at the bar of the court, as directed by the statute.

The defendant, Nathanial B. Hartman, the appellant here, answered the bill, averring that "the said paper writing is the true and lawful last will and testament of the decedent, who, at the time he signed, sealed, and declared it to be such, was of sound mind and disposing memory, and in all respects capable of making his will, and that he made the same of his own free will."

An issue was accordingly made up and tried at the bar of the court, upon which, the jury rendered a verdict as follows: "We, the jury, find that the paper writing in the bill mentioned, admitted to probate as the last will and testament of George Hartman, deceased, is not the true last will and testament of the said George Hartman, deceased."

The defendant thereupon moved to set aside the verdict as being contrary to the law and the evidence, and for a new trial; but the court overruled the motion, and entered a decree in accordance with the verdict. To this action of the court the defendant excepted, and the evidence is certified in the bill of exceptions.

The probate proceeding in the county court was *ex parte*, under the provisions of sec. 34, ch. 118, of the Code of 1873. That section also enacts as follows: "After a sentence or order under this section, a person interested, who was not a party to the proceeding, may, within five years, proceed by bill in equity to impeach or establish the will, on which bill a trial by jury shall be ordered, to ascertain whether any, and if any, how much of what was so offered for probate be the will of the decedent. If no such bill be filed within that time, the sentence or order shall be forever binding."

Under this statute it has been heretofore decided by this court, that though the proceeding to impeach or establish a will admitted to probate is "by bill in equity," yet the verdict of a jury rendered upon an issue *devisavit vel non* stands on a different footing from that of a verdict in an ordinary issue out of chancery. And the reason is obvious. In the latter case, the issue is a mere incident of the chancery suit. Its object is to satisfy the conscience of the chancellor, who may set aside the verdict, if dissatisfied with it, and direct another issue, or he may dispose of the cause without the aid of another jury.

On the other hand, in ordering an issue *devisavit vel non*, the chancellor does not exercise any of the ordinary powers of a chancery court, but acts in obedience to the express mandate of the statute; the object of the issue being to ascertain, by means of a jury trial, whether or not the will admitted to probate is, in whole or in part, the will of the decedent. When

that question is decided the function of the suit is exhausted, and the verdict is binding upon the court, unless for good cause shown it is set aside, either at the trial or afterwards, on a bill of review. *Malone's Adm'r* v. *Hobbs,* 1 Rob. R., 346; *Coalter's Ex'or* v. *Bryan and Wife,* 1. Gratt. 18; *Lambert* v. *Cooper's Ex'or,* 29 Id. 61; *Connolly* v. *Connolly,* 32 Id. 657.

It follows, therefore, that the verdict in the present case is entitled to the same weight as a verdict in an action at common law, and its correctness must be tested in the appellate court by the same rules; that is to say, the evidence, and not the facts, being certified, the verdict must stand, unless, after rejecting the evidence for the exceptor, all of which was parol, and giving full force and credit to that of the appellees, the decision of the lower court still appears to be wrong. *Lamberts* v. *Cooper's Ex'or, supra.*

Applying this rule to the present case, is the decree complained of erroneous? It is conceded that the instructions given to the jury correctly propound the law. The case turns upon the facts, which, as disclosed by the evidence for the appellees, are few and simple.

It appears that George Hartman died on or about the 1st of March, 1884, a little more than one month after the will was executed. At the time of his death he was a very old man, having attained the age of eighty-five years, and for several years prior to his death he had been "in feeble health and crippled with rheumatism." He left two children, the appellant and the female appellee, his only heirs-at-law. His estate consisted of a tract of land in Roanoke county, containing about one hundred and ten acres, upon which he resided, and some personalty, the value of which does not appear. Of this he devised ten acres of the land, of comparatively inferior quality and value, to his daughter, Mrs. Strickler; the residue of his estate he devised to his son, who was named in the will as executor.

For several years prior to the execution of the will, the son lived with the father, and during that time, in the language of one of the witnesses, "had his own way; always fussing with the old man, and abusing his sister." In fact, it would seem that his will was not only supreme, but that he ruled his aged and helpless father with a rod of iron. It appears that the daughter, to whom the father was much attached, left his home upon her marriage, which occurred about two years before the execution of the will, and lived with her husband in the same neighborhood. She was forbidden by the brother to visit her father, and on one occasion when leaving the house in company with an aunt, she was cursed by her unnatural brother, whom she had in no way wronged, and who uttered threats as to what he would do if she returned again, couched in language too indecent to be repeated.

On one occasion when the daughter, having broken her arm, was confined to her house in Salem, the old man requested his son to go and inquire as to her condition, which he refused to do, saying, with an oath, that there was nothing the matter with her. There is other evidence in the case, showing not only the most brutal animosity on the part of the brother towards the sister, but a determination, for reasons very apparent, to prevent, if possible, all communication between her and the father.

It appears that on one occasion the latter started to visit his daughter, when he was seized by the son, and ordered to return into the house, who told him if he did not return, " he would pull down his breeches and whip him;" "and the old man," says an eye-witness, "went back into the house crying." On another occasion, when he declared his purpose to visit his daughter, he was prevented from doing so by the son, who again threatened him with personal chastisement if he went. This was some time after the daughter's marriage, and it does not appear that he made any further attempt to visit her.

In addition to this, it appears that the old man repeatedly declared his intention not to make a will, saying that he wished his estate to be equally divided between his children, and that the law would make a better will for him than he could make. This was repeated to the son by one of the witnesses, who testifies that some time afterwards he was asked by the old man why he had told "Nat" (the appellant) what he had said about not making a will, saying "it had caused him a great deal of trouble; that they (meaning the appellant and his wife) had him tied down, and that he was unable to do anything, but that he would leave it to the law to decide." This was a little more than a year before the will was made.

On another occasion, less than two years before his death, the old man remarked to one of the witnesses that Nat and his wife wanted him to make a will, but that he did not intend to do so. To the same witness he also said that Nat's wife was so high-tempered and disagreeable that he was afraid of her; that he would not make her mad for anything in the world, for he did not think she was any too good to kill him, or any one else, if she got mad. It also appears that on one occasion, when informed of his father's declared intention to leave his property to be equally divided by law among his children, the appellant remarked that he intended to have it *all.*

Such, substantially, is the evidence for the plaintiffs, and we are of opinion that the decree approving the verdict is right.

It is seldom, perhaps, that a case arises in which undue influence upon a testator, vitiating a will, is more clearly apparent from the circumstances surrounding the execution of the instrument than in the present case. It is difficult to see how the jury could have arrived at any other conclusion than that the will was not the unconstrained act of the decedent, but was obtained from him in his unhappy condition under such circumstances as to amount to force and coercion, destroying free agency.

. It is shown that he repeatedly declared his intention not to make a will, intending that his daughter, whom he loved with parental affection, should share equally in the division of his estate. And why this purpose was abandoned, within a few weeks prior to his death, may be readily inferred from the evidence. The only rational explanation is, that the father, enfeebled by age and other infirmities, was under the controlling influence of the son.

The question as to what is undue influence, such as to overcome the will or control the judgment of a testator, largely depends upon the circumstances of each case, the chief of which are the dispositions contained in the will, the situation of the testator, and his mental and physical condition at the time the will is made. "And the better opinion seems to be that whenever influence is successfully employed to induce a testator to make a grossly unequal disposition of his property, or disregard the ties of blood without sufficient cause, it should be viewed as illegitimate, and may be treated as undue." Notes to *Huguerrin* v. *Basely*, 2 Lead. Cas. Eq., Pt. II, page 1265. On the other hand, where the provisions of the will accord with the affections and previous declarations of the testator, and are such as might have been justly expected, that is persuasive evidence both of testamentary capacity and freedom of action. *Young* v. *Barner*, 27 Gratt. 96.

"There are few things," it has been well said, "in which mankind more generally agree, than in the wish that their property should devolve after death on their descendants," and where "a will which runs counter to this sentiment is made in favor of one who is so placed as to have a controlling power over the testator's mind, it is not unreasonable to require him to show that he did not bring about a result that would not have ensued in the normal course of events."

Where a will executed by an old man differs from his previously expressed intentions, and is made in favor of those who stand in relations of confidence or dependence towards him, it raises a violent presumption of fraud and undue influence, which should be overcome by satisfactory testimony. 1 Williams on Ex'or, 58, *note.*

Nor is it essential to the application of the principle that unsoundness of mind on the part of the testator should be shown. The question is not whether the testator knew what he was doing, but how the intention was produced; and if it appears that it arose from the controlling influence of force, imposition, or fraud, that is sufficient ground for setting aside a will. It is not necessary, however, to show that undue influence was exercised at the very time the will was executed. It is sufficient that the will was executed afterwards, under the control of such influence. Hence, proof that a son imperiously told his father, some time prior to the execution of the will, to "shut up and not make so much noise," and that the father obeyed, has been held admissible as showing that the son had both the power and the disposition to exercise a controlling influence over the father's mind. 2 Lead. Cas. Eq., Pt. II, p. 1280. See also *Tyler* v. *Gardiner*, 35 N. Y., 559; S. C., Redf. Am. Cas. upon the law of wills, 451, *et seq.*

In the light of these principles, we are of opinion that the decree pronounced by the learned judge who presided at the trial, and saw the witnesses, and heard them testify, must be affirmed. *Dudleys* v. *Dudleys*, 3 Leigh, 436; *Parramore* v. *Taylor*, 11 Gratt. 220; *Montague* v. *Allan's Ex'or*, 78 Va. 592.

DECREE AFFIRMED.