# Wytheville

CATHERINE REDFORD, ET ALS. v. FLORENCE DYSON BOOKER, ET ALS.

June 11, 1936.

Present, Holt, Hudgins, Chinn, Gregory and Eggleston, JJ.

The opinion states the case.

*Fulton & Hall* and *E. T. Reeves, Jr.*, for the appellants.

*Aubrey R. Bowles, Jr., Henry C. Riely, Sam B. Witt, Jr., Henry W. Oppenhimer* and *Holmes Hall*, for the appellees.

HOLT, J., delivered the opinion of the court.

On February 4, 1933, Mrs. Lillian A. Redford, whose maiden name was Dyson, died childless and without direct descendants. She was then sixty-eight or sixty-nine years old, lived in Richmond and had for many years conducted a successful boarding house there. When quite young she married Mr. Nick Redford. After his death she married Mr. Macon Cease. They were divorced and she resumed the name of Redford. In January, 1932, she executed this will:

"I, LILLIAN A. REDFORD, of the City of Richmond, Virginia, being of sound and disposing mind and memory, do hereby make, publish and declare this my last will and testament, hereby revoking all other wills at any time heretofore made by me.

"FIRST: I desire that all my just debts and funeral expenses be paid as promptly as practicable.

"SECOND: I give and bequeath to my cousin, Jack Dyson of Crewe, Virginia, the sum of One Thousand Dollars ($1,000), for the education of his children.

"THIRD: I give and bequeath to my cousin, Nick Redford, Sr., of Richmond, Virginia, the sum of One Thousand Dollars ($1,000).

"FOURTH: I give and bequeath to my cousin, Rosalie Rapp, of Lynchburg, Virginia, the sum of One Thousand Dollars ($1,000).

"FIFTH: I give and bequeath to a friend, J. Herbert Lively, of Richmond, Virginia, the sum of One Thousand Dollars ($1,000) and the following personal effects and furniture found in the room I now occupy: One four poster mahogany bed, with springs and mattress, two pillows, one dresser with mirror, one desk, one chifforobe, one sewing table, one drugget, one bed lamp, one straight chair, one rocking chair, pair of woolen blankets, one dozen towels, and one green damask table cloth with six napkins to match.

"SIXTH: I give and bequeath to my cousin Freeman Spencer, Jr., of Richmond, Virginia, the sum of Fifty Dollars ($50).

"SEVENTH: I give and bequeath to my cousin, Lula May Dyson, daughter of Billy Dyson of Crewe, Virginia, the sum of Fifty Dollars ($50).

"EIGHTH: I give and bequeath to my servant, Sarah Rock, if in my employ at the time of my death, the sum of One Hundred Dollars ($100).

"NINTH: I give and bequeath to my step-daughter, Myrtle Redford Rowe, of Richmond, Virginia, all of my stocks and bonds of every kind and description and I direct same shall be held by my Executor as Trustee, and the income therefrom paid her in monthly installments, so long as she lives. At her death I direct that the said property shall be disposed of as follows:

"(a) I direct that there shall be paid to my cousin, Harry McDearman, of Emporia, Virginia, the sum of One Thousand Dollars ($1,000).

"(b) I direct that there shall be paid to my cousins, William T. Luck, Jr., Rosalie Ann Luck, and Julian Tyler

Luck, all of Richmond, Virginia, the sum of One Thousand Dollars ($1,000), to be equally divided between them.

"(c) I direct that there shall be paid to my cousins, Catherine and Dora Louise Dyson, daughters of Bruce Dyson of Crewe, Virginia, the sum of Fifty Dollars ($50) each.

"(d) To the Grace Covenant *Presbyterian* Church of Richmond, Virginia, the sum of Five Hundred Dollars ($500).

"TENTH: I give and bequeath to my cousin, Roland Grom of Richmond, Virginia, my lot located in Jamesburg and Helmeta Park, New Jersey.

"ELEVENTH: I give and bequeath to my cousin, Julian Tyler Luck of Richmond, Virginia, all of my one-half interest in the farm, "Aspen Hall," Nottoway County, Virginia and all my interest in the furniture and personal property located thereon.

"TWELFTH: I give and bequeath unto Lillie Redford, wife of Nick Redford, Catherine and Margaret, daughters of Nick Redford, cousins, all of Richmond, Virginia, all sterling silverware, knives, forks, spoons, carving sets, and bread tray to be equally divided between them. I also desire Catherine Redford to have my large platinum solitaire diamond ring surrounded with small diamonds. I also desire Margaret Redford to have my dinner diamond platinum ring.

"THIRTEENTH: I give and bequeath to my cousins, Rosalie Ann Luck, of Richmond, Virginia, one three strand string of pearls. To Catherine Dyson, daughter of Bruce Dyson of Crewe, Virginia, one amethyst pin and small amethyst chain. To my niece, Irma Dyson Grom of Richmond, the miniature of Kate I. Dyson and one colored linen table cloth with twelve napkins to match. To Katie Dyson Spencer and Florence Dyson Booker, cousins, of Richmond, each to have one colored linen table cloth with twelve napkins to match. To Kate Dyson, cousin, and widow of M. S. Dyson, of Cincinnati, Ohio, one cameo pin *surrounded* with pearls. To Leola and Mar-

garet Dyson, daughters of the late M. S. Dyson of Cincinnati, my diamond ring with two large stones, each to have a stone. To my cousin, Elizabeth Tyler Luck of Richmond, my white silk fringed evening shawl, and my large chime clock. To Rosa M. Tyler, my cousin of Richmond, one cameo pin, one drop leaf *mahogany* table, one lock safe, all remain—jewelery and articles of personal use or ornament, all linen sheets, all colored sheets and pillow cases.

"FOURTEENTH: I desire that all my wearing apparel not otherwise bequeathed in said will be divided equally between Myrtle Redford Rowe of Richmond and Rosalie Rapp of Lynchburg.

"FIFTEENTH: I give and bequeath to my cousin, Julian W. Tyler, of Richmond, Virginia, my residence, No. 1814 Hanover avenue, Richmond, Virginia, with the understanding that if my estate at my death does not have sufficient funds to pay off all of the bequests in said will, this property shall be sold either publicly or privately and each beneficiary paid, the remaining amount to be given to the said Julian W. Tyler.

"SIXTEENTH: If after all bequests are given in said will whatever amount or amounts remain to my credit in the various banks I desire these amounts be given my cousin, Elizabeth Tyler Luck.

"SEVENTEENTH: I desire that all remaining household linens, spreads, sheets, pillow cases, table cloths, towels, blankets, etc., to be given to the Richmond Home for Ladies, 2620 Stuart avenue, Richmond, Virginia.

"EIGHTEENTH: I desire that all remaining household furniture, beds, tables, chairs, dressers, etc., to be given to the Confederate Home for Needy Women, in Richmond, Virginia.

"NINETEENTH: I desire to be buried in my section in Hollywood Cemetery and I desire the remainder of this section not then occupied to be given to Frank V. Baldwin, Sr., of New York.

"TWENTIETH: I desire a sufficient amount to be reserved by my estate to purchase and erect a nice tombstone at my grave in Hollywood. This stone to be selected by Rosa M. Tyler.

"TWENTY-ONE: I nominate and appoint Julian W. Tyler as Executor of this my last will and testament, and I request that no security be required of him upon his qualification as such Executor.

"I authorize and empower my said Executor to retain in kind any investment which may come into his hands if deemed wise to do so, or to sell the same and re-invest in other property.

"I also authorize and empower my said Executor to sell any real estate owned by me at the time of my death, either publicly or privately, and to re-invest the proceeds in other property, either real or personal.

"Given under my hand and seal this........day of January, 1932.

LILLIAN A. REDFORD.<br>(Seal)

"Signed, sealed, published and declared as and for her last will and testament by Lillian A. Redford, in the presence of us, who in her presence, at her request and in the presence of each other have hereunto set our hands as attesting witnesses.

L. J. POWERS,<br>A. T. AUGUST, JR.,<br>J. M. GATEWOOD."

On January 13, 1933, this paper was presented in the Chancery Court of the City of Richmond, and without objection was proven and recorded as and for the last will and testament of Lillian A. Redford, dec'd. It distributes an estate estimated at about $15,000.

On October 25, 1933, these complainants, Florence Dyson Booker, Kate Dyson Spencer, E. Rosenegk Dyson, Macon A. Dyson, Irma Dyson Grom, H. Thomas Dyson, Leola A. Dyson, Margaret J. Dyson, and Lee Edward

Dyson, who are the distributees and heirs at law of Mrs. Redford, filed in that court their bill in which they charged that this writing was not her true last will and testament in that at the time of its execution she was mentally incapable and under undue influence. This is their relationship to her:

Florence Dyson Booker, Kate Dyson Spencer, E. Rosenegk Dyson, Macon A. Dyson, Irma Dyson Grom, and H. Thomas Dyson are the only children of William Thomas Dyson, a deceased brother of said Lillian A. Redford, Leola A. Dyson, Margaret J. Dyson, and Lee Edward Dyson are the only children of M. S. Dyson, a deceased brother. She left no other descendants of deceased brothers and sisters except the complainants.

This cause was matured in due course. The issue of *devisavit vel non* as framed and submitted reads:

"Whether or not a certain paper writing dated January...... 1932, constitutes the last will and testament of said Lillian A. Redford, deceased."

In the order of submission it was directed that the beneficiaries under the paper writing of January, 1932, occupy the position of plaintiffs and the complainants that of defendants.

That is to say, upon these plaintiffs rests the burden of proof. The burden of proving testamentary capacity is on the propounder of the will and continues upon him throughout any contest on that question. *Dickens* v. *Bonnewell,* 160 Va. 194, 168 S. E. 610; *Good* v. *Dyer,* 137 Va. 114, 119 S. E. 277. This burden of proof is not to be confused with the burden of producing evidence. That burden frequently passes from party to party during the progress of a trial, but the necessity of proving his case always rests upon the plaintiff and never shifts. *Riggsby* v. *Tritton,* 143 Va. 903, 129 S. E. 493, 45 A. L. R. 280. Thus upon a case like this, if all the statutory requirements for due execution be shown the legal presumption of sanity comes to the proponents' relief. A *prima facie* case is

made out, and the burden then rests upon the contestants
to produce evidence if this presumption is to be overcome.
*Rust* v. *Reid,* 124 Va. 1; 97 S. E. 324.

After the subscribing witnesses, Powers and August,
had testified, counsel for contestants moved the court to
strike out their testimony on the ground that due execu-
tion of the will had not been shown. That motion was
overruled and an exception taken. It was renewed when
all of the evidence was in and was again overruled and
exception taken.

Mr. Powers is a collection teller for the State-Planters
Bank of Richmond. He had not theretofore known Mrs.
Redford, but was asked to act by Mr. Gatewood, a co-
subscribing witness now dead, and does not remember
if this request was made in the presence of the testatrix.
He neither read the will nor the attestation clause, nor
was the will read to the testatrix. Mr. Gatewood said that
this was the will and that is all this witness knew about
it. The actual signing was in all respects regular.

Mr. August is also a clerk in this bank. He was called
to act by Mr. Gatewood, and said, "We were asked to go
up and witness her signature and we all signed it in the
presence of each other; at least, we witnessed her signa-
ture." It was on this occasion that he met her for the
first time. The will was not read and he recalls no direct
statement to the effect that the paper writing was a will
at all. He did not read it and does not remember having
read the attestation clause, or that Mrs. Redford asked
him to sign. There was present the subscribing witnesses
and the executor, Julian W. Tyler. Neither of these wit-
nesses saw anything suspicious about the transaction or
about the appearance of the testatrix. They were called
in as a matter of routine; there was nothing to charge
their memory with details of the transaction.

We have seen that Mr. Tyler was present. His
evidence is:

"Q. Tell the jury who was present and what she did
when you and she got to the bank?

"A. When we got to the bank I talked to Mr. Gatewood, who was one of the officers of the Broad Street Bank, and told him I wanted this will executed.

"Q. Was she present?

"A. She was present. He called two young men from the rear, and when they were present she signed her name.

"Q. Wait until we get there. You went to the bank. Whom did you see first at the bank?

"A. Mr. Gatewood.

"Q. Did she have the will with her then?

"A. Yes.

"Q. Did she give it to Mr. Gatewood?

"A. Yes.

"Q. And in your presence what happened?

"A. I told Mr. Gatewood that she wanted the will signed in due form, and wanted to have two more signatures. He got Mr. August and Mr. Powers to come; she signed it and said, 'This is my signature and this is my will,' I said to those young men, 'You read it now and see what it is before you sign it,' and they did.

"Q. What did they read? The original will?

"A. This (indicating) is what they read.

"Q. They read that attestation clause, did they?

"A. Yes.

"Q. 'Signed, sealed, published and declared as and for her last will and testament by Lillian A. Redford, in the presence of us, who in her presence, at her request and in the presence of each other, have hereunto set our hand as attesting witnesses.' They read that?

"A. Yes."

■ Mr. Tyler was not an attesting witness and could not supply deficiencies, but he could tell what was done in his presence.

■ It is to be observed that there is a sharp conflict between this testimony and that of the attesting witnesses. The failure of Powers and of August to acquaint themselves with the contents of the document which they were witnessing does not make it void. The able chancellor

was of opinion that the actual execution was satisfactorily shown. We accept his judgment.

After a trial which lasted for some days a jury returned this verdict:

"We, the jury on the issue joined in the above-styled matter find that the paper writing bearing date the...... day of January, 1932, is not the true last will and testament of Lillian A. Redford, deceased,"—
which over the objections of the defendants in this suit was confirmed by the chancellor presiding.

The verdict in an issue out of chancery is not to be confused with one upon an issue of *devisavit vel non*. It is but an incident in litigation in which there may be many issues, and is intended to satisfy the conscience of the chancellor but does not control him. A verdict on an issue of *devisavit vel non* ends the litigation in that cause to the same extent that a jury's verdict settles it in a common-law action.

In *Lamberts* v. *Cooper's Ex'r*, 29 Gratt. (70 Va.) 61, Judge Staples, speaking for this court, said:

"* * * the rules which govern upon an issue out of chancery for the trial of a disputed fact to satisfy the conscience of the chancellor are very different from the rules which govern upon an issue *devisavit vel non* * * * the issue *devisavit vel non* is a statutory proceeding. 'It is the sole *object*, and not the mere *incident* of the suit.' It is not intended to inform the conscience of the court, which is bound to decree according to the verdict, unless for good cause shown a new trial is granted. It is a probate jurisdiction exercised by the jury in order to the final probate of the will. * * * According to these principles it would seem to be clear that upon the trial of an issue *devisavit vel non*, the mode of proceeding upon the trial is substantially the same as upon the trial of common law actions."

See also, *Rickard* v. *Rickard*, 134 Va. 485, 115 S. E. 369; *Coalter's Ex'r* v. *Bryan and wife*, 1 Gratt. (42 Va.) 18; *Malone's Adm'r* v. *Hobbs*, 1 Rob. 346, 39 Am. Dec. 263.

In *Culpepper* v. *Robie,* 155 Va. 64, 154 S. E. 687, 691, a will case, Mr. Justice Hudgins said: "In view of the verdict of the jury, it is necessary to consider all material conflict in the testimony as settled by the verdict in favor of the contestants."

In *Smith* v. *Ottley,* 144 Va. 406, 132 S. E. 512, 513, another will case, Campbell, J., said: "All conflicts, if any, have been resolved in favor of the defendants in error."

In *McComb* v. *Farrow,* 128 Va. 455, 104 S. E. 812, 818, also a will case, Burks, J., said:

"Under these conditions it was for the jury to decide whether the testator was of sound and disposing mind on May 3, 1913. The question was submitted to the jury, and instructions were given, to which there were no objections, covering every phase of the case, and the jury found against the will of May 3, 1913, and in favor of the will of February 2, 1910. This is not a case in which either the trial court or this court could interfere with the verdict of the jury."

See also, *Palmer* v. *Showalter,* 126 Va. 306, 101 S. E. 136.

The statute itself tells us when verdicts and judgments may be set aside, Code, section 6363. This shall not be done "unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it."

In dealing with mental incapacities we said:

"Neither sickness nor impaired intellect is sufficient, standing alone, to render a will invalid. If at the time of its execution the testatrix was capable of recollecting her property, the natural objects of her bounty and their claims upon her, knew the business about which she was engaged and how she wished to dispose of her property; that is sufficient. Moreover, those who would impeach a will on the ground that the decedent had become incompetent must clearly prove that incompetency to exist." *Tabb* v. *Willis,* 155 Va. 836, 156 S. E. 556, 564.

██ Undue influence is a species of fraud. He who alleges it must prove it by clear and satisfactory evidence. *Core* v. *Core's Adm'rs,* 139 Va. 1, 124 S. E. 453.

"Before undue influence can be made the ground for setting aside a deed, it must be sufficient to destroy free agency on the part of the grantor; it must amount to coercion—practically duress. Suggestion and advice, addressed to the understanding and judgment, do not constitute undue influence, nor does solicitation, unless the party be so worn by the importunities that his will gives way. Earnest entreaty, importunity and persuasion may be employed, but if the influence is not irresistible it is not undue, and its existence is immaterial, even though it is yielded to. *Greer* v. *Greers,* 9 Gratt. (50 Va.), 330, 333; *Orr* v. *Pennington,* 93 Va. 268, 24 S. E. 928; *Hammond* v. *Welton,* 106 Mich. 244, 64 N. W. 25; *Hamilton* v. *Smith,* 57 Iowa 15, 10 N. W. 276, 42 Am. Rep. 39. To set aside a deed for undue influence, it must be shown to the satisfaction of the court that the party had no free will, but stood *in vinculis. Conley* v. *Nailor,* 118 U. S. 127, 6 S. Ct. 1001, 30 L. Ed. 112." *Jenkins* v. *Rhodes,* 106 Va. 564, 569, 56 S. E. 332, 334.

See also, *Jenkins* v. *Trice,* 152 Va. 411, 147 S. E. 251.

██ In short form, the rule is this: "Undue influence is a substitution of the dominant will for that of the ostensible actor."

Influences vary under conditions in which they are exerted. Those which induce one *in extremis* to disinherit his people and establish a charity might have been wholly without effect upon him when in his accustomed health.

"It is a matter of common knowledge that a person of feeble intellect is much more easily influenced by undue means than is one of a vigorous mind; therefore, in passing upon a question of undue influence, the strength and condition of the mind may become a proper, indeed an essential, subject of inquiry; for although weakness, whether arising from age, infirmity, or other cause, may not be sufficient to create testamentary incapacity, it may

nevertheless form favorable conditions for the exercise of undue influence." *Herster* v. *Herster,* 122 Pa. 239, 16 A. 342, 344, 9 Am. St. Rep. 95.

"The mental weakness of one of the parties is an important element in raising a presumption of undue influence or of determining its existence." 6 R. C. L., p. 638.

Manifestly these are preeminently matters for the jury.

"Therefore, questions of undue influence are submitted to the jury with greater readiness when the testator is shown to have been in a state of physical feebleness or mental weakness when the will was executed." 28 R. C. L., p. 139.

Of course, conditions at the date of the execution of the will govern. Adverse conditions which afterwards develop are not important, but the situation at some subsequent date may be.

"There are types of mental unsoundness which appear suddenly and may be of short duration, and in such cases, the proof, to be of any avail, must come near to the precise time when the act was performed; but the decadence of old age, and many forms of mental derangement and imbecility, are of slow advancement, and proof of their distinct development, at any given period, will afford pretty clear ground to infer their existence for a long period, either before or after, with a considerable degree of certainty. *Grant* v. *Thompson,* 4 Conn. 203 [10 Am. Dec. 119]." *Herster* v. v. *Herster, supra.*

The probabilities are that one who suffers from *senile dementia* today suffered from it yesterday.

But as we have frequently had occasion to observe, all of these are matters of primary consideration by the jury. For example, if there be competent evidence tending to show undue influence which is accepted by the jury, then we in turn must accept it, and this notwithstanding the fact that there may be abundant testimony tending to show that a testator acted of his own free will. Indeed such evidence may be so strong as possibly to have led us to a different conclusion as an original proposition.

If this were not true we would sit not as an appellate court but as one of original jurisdiction, and substitute our verdict for the jury's verdict. *Planters Nat. Bank of Fredericksburg* v. *E. .G. Heflin Company,* ante, page 166, 184 S. E. 216.

All of which brings us back to this: Is the verdict and judgment plainly wrong or without evidence to support it? If it is, we should set it aside. If it is not, we can not.

In contests of this kind we turn first to the testimony of attesting witnesses. Usually they know what they are doing. The presumption is that they would not aid in the execution of a will had they cause to doubt its validity. If there be any question, *Jenkins* v. *Trice,* 152 Va. 411, 147 S. E. 251, 256, gives us an excellent example of what should then be done. There "the attesting witnesses, after conference, deliberately reached the conclusion that the testator was competent to make a will." On the other hand:

" * * * if they had no previous acquaintance with the testator, were not selected by him, and nothing was said or done by him at the time to indicate his then mental condition, it is said that their testimony is not accorded the weight which would otherwise attach to it." *Forehand* v. *Sawyer,* 147 Va. 105, 136 S. E. 683, 688; *Thornton* v. *Thornton's Ex'rs,* 141 Va. 232, 126 S. E. 69.

The evidence of Powers and August has been stated. They were strangers to Mrs. Redford, took no interest in the transaction and witnessed this will merely because they were asked to do it. They did not even take the trouble to read the attestation clause. They do not help us.

We turn next as a matter of course to the testimony of experts and of the family physician.

Dr. H. Ward Randolph had been the family physician of Mrs. Redford since 1926. In 1930 she consulted him as to the wisdom of a trip abroad. He thought that she might go in safety and so advised her, although she was then suffering from high blood pressure. Upon her return she called him into consultation. He found that her

eyesight was very bad and sent her to Dr. Hill to be examined. This was in September. On October 7th she had an apoplectic stroke accompanied by loss of consciousness and followed by a dazed condition. Her left side was somewhat affected. On October 16th he sent her to the McGuire clinic where she was again examined. This time by Dr. James Smith. The result of these examinations confirmed the opinions which Randolph had theretofore formed,—that is to say, the basic trouble was hardened arteries and pressure in the brain, which in turn affected the vision.

The trouble was inter-cranial, she became nearly blind and it was necessary to employ a nurse. From the physical effects of this first stroke there was a partial recovery, she was able to go about and attend to some business, but there was steady physical and mental deterioration until October 13, 1932, at which time she suffered another apoplectic stroke from which there was no recovery. Dr. Randolph was asked to say just when incapacity began and answered:

"That is a difficult question for us to answer. This thing started in 1930, after she had that attack in the fall of 1930, and it was a gradual thing. In the fall of 1930 it started. In 1931 she was forgetful and was not as mentally alert as she had been, and I would say she became somewhat childish, but the exact date when that occurred it would be a hard matter for me to say."

Dr. E. Finley Gayle, a specialist in nervous and mental diseases, was called into conference. He saw the patient on November 12 and November 22, 1932, and found her unable to grasp related facts as to time, place and persons. She was not then mentally competent. He, too, thought that the trouble came from hardened arteries, and that diagnosis does not appear to be questioned.

At the McGuire clinic an examination was made by Dr. James Smith, who made a report in writing. Dr Smith was not called as a witness, and it is contended by the proponents that we may infer from this that his evidence,

if given, would have been adverse. *Altavista Cotton Mills* v. *Lane,* 133 Va. 1, 112 S. E. 637.

On the second day of the trial the report of Dr. Smith was tendered in court by counsel for contestants. It was objected to as evidence on the ground that Dr. Smith was an available witness and should be called to testify in person. He was then sick and the matter went over. His report was identified but was not received in evidence. On the fourth day of the trial contestants concluded their evidence in chief with the exception of Dr. Smith's testimony, who was still sick. Of course the date of his recovery could not be known. Proponents were unwilling to go on with the understanding that he might be called later and out of order. In these circumstances contestants forego the testimony of this witness and rested their case. There was nothing mysterious about Dr. Smith's report. It was in court, though not in evidence, and subject to inspection.

Dr. R. W. Vaughan, a witness for the proponents, and an eye specialist, said that he saw Mrs. Redford on January 2, 1932, on February 5th, on February 16th and on March 24th following. He examined her eyes and found that she could see plainly objects directly before her but not those to one side. The reasons for this impairment are to a layman not particularly definite, but he does tell us that the patient was suffering from "a slight cirrhosis, with impaired vision." In this connection it may be noted that Dr. Vaughan thought that Mrs. Tyler who came to his office with Mrs. Redford was her sister, although he did not undertake to say definitely from which one of these ladies this information came.

A detailed analysis of all the evidence would be tedious and unfruitful. Thirty-eight witnesses have testified.

For the contestants there is evidence to show or tending to show that Mrs. Redford went to Europe well and came back sick. Returning her vision appeared to have become suddenly impaired. She became so unwell that she could not dress herself without assistance.

· She could read nothing but headlines, and although fond of cards could not at times read their faces. Her memory was inattentive. Formerly self-reliant, she became childish and dependent upon others. Anybody could induce her to do anything. Staunch in former friendships, she became unstable in her likes and dislikes; would turn upon one today and forget it tomorrow. An illustration of this instability, she said that the Tylers were selfish, "that she didn't trust Mr. Tyler; that she wouldn't trust him, as she said, beyond a broom straw", and yet she executed to him a power of attorney and gave into his hands the complete management of her estate. During all of this time there was steady physical and mental deterioration. In short, this woman who had stood four-square bent to all the winds that blew.

For the proponents there is evidence that shows or tends to show that Mrs. Redford came home from her European trip in fairly good condition; that from the slight stroke of October 7, 1930, she made a satisfactory recovery, and from then until the stroke of October 13, 1932, with the exception of a short period following her first illness she was able to attend and did attend to all of the ordinary affairs of her home. They do not contend that she was perfectly well but they do claim that she was in complete control of her faculties and that her vision was not impaired beyond the defects stated by Dr. Vaughan. This conflict was submitted to the jury and a verdict at their hand either for the proponents or for the contestants this court under settled rules of procedure must sustain so far as the facts in issue are concerned.

Mr. Tyler and Mrs. Redford had been friends for many years, as were their wives, who were cousins. Before the testatrix went to Europe the matter of the execution of a will seems to have been discussed. As time drew short he reminded her of this and was disturbed and disappointed when told it had been written.

In October, 1931, he was attending to some of her affairs, notably the Nottoway farm, and on December 15,

1931, she executed to him a power of attorney and gave to him complete control over her estate of every kind and character. This power of attorney he drew up and his wife witnessed it.

He at once took charge of her bank accounts and withdrew most of her deposits. The record tells us little as to what he did with them, and particularly does not tell us what became of $1,120.54 withdrawn by check dated January 30, 1932, payable to himself. During this time he and his wife were so assiduous in their attentions to Mrs. Redford that it caused comment in the boarding house. In her final illness he took this will from the house and placed it in a bank for safe-keeping. He tells us that it was written at the request of Mrs. Redford and without aid at all from him;—in other words, that it is her disposition of her property, and that he merely carried out unsuggested instructions.

He is named as executor, with the request that no security be required of him as such; more than half of the estate is given to him and to his immediate family. Her nieces and nephews who would have been her heirs at law and distributees and whose relationship with her was cordial are given practically nothing, a miniature, some table linen and a diamond ring with "two large stones."

The will itself covers many items, and when Mrs. Myrtle Rowe, a step-daughter, expressed disappointment at provisions made for her, Mrs. Tyler answered that it "was very widespread and she didn't think it could be broken," from which it is argued that gifts other than to the Tylers were but makeweights.

Roger Dyson was Mrs. Redford's cousin. Just before she went to Europe she called him into conference and said that she wanted him to write a will. A satisfactory draft was prepared; he told her to copy it in her own handwriting. This she afterwards did. One thousand dollars was given to John W. Dyson, the Hanover avenue home to Mrs. Myrtle Rowe and the balance to her nieces

and nephews. At Mrs. Rowe's death the house was to be sold and the proceeds divided among them.

After her return and while she was at the McGuire clinic she sent again for Roger Dyson, and said to him that the first will had mysteriously disappeared and that she wanted another written, to the same general tenor and effect. This he did and gave it to her upon her return home. That will also was lost or misplaced and he wrote another for her in substance the same. It, too, was lost.

In the latter part of August, 1932, she again sent for Mr. Dyson. He tells us what then took place:

"She said the third one (will) had disappeared too, that she didn't know what in the world had become of it, that she put it in a locker at the house and it was gone, and she asked me to come over, and said that she wanted to change this will entirely. I said, 'Just what do you want to do?' She said, 'I want to leave everything to you to dispose of.' I said, 'For Heaven's sake, don't do that; I have got troubles enough now.' She said, 'That exactly what I am going to do.' She went over and got Mr. Eanes to write a will that left everything to me, with the understanding that I would let Mrs. Rowe live in the house for her lifetime, and give my youngest brother $1,000, the same provision as the other. I said, 'What do you want about the residue?' She said, 'Divide that up as the other one.' I said, 'Hadn't you better let the law settle it? Doggone it, it will be the same thing'. She said, 'No. I want Myrtle to have the use of that house and lot, and I want Jack (my brother) to have that thousand dollars and I am looking to you to dispose of it that way'."

In none of these wills were the Tylers mentioned and the draftsman gave nothing to himself.

██ Plainly one may change her will from time to time, and this is to be expected where conditions change. *Jenkins* v. *Trice, supra.*

This Mr. Tyler undertakes to meet by telling us that the Dyson children had inherited $65,000 which Mrs. Redford said left her free to do as she wished with her

own. We do not know when this sum was left to these children but it is plain that she continued to have them in her mind after the will in judgment had been written.

No reason is assigned for the practical disinheritance of the step-daughter, Myrtle Rowe, who does not get the Hanover avenue home but dividends from stock amounting to about $10 a month.

It is pertinent to remember that Mr. Dyson did not think that Mrs. Redford could make a will, but wrote to humor her. Moreover the general provisions in all of these wills which he had drafted were the same, and her right to make a will before she went to Europe is not questioned.

■■■ The right to change a will is not questioned, but where this change overturns a purpose long manifest it is of evidential value as in some measures gauging the mentalities of the testatrix and the influences which brought it about. *Hartman* v. *Strickler,* 82 Va. 225, 238.

Where there is steady mental deterioration, it is exceedingly difficult to tell just what conditions were at any certain date. It is like going from daylight into dark.

■■■ We have seen that when statutory requirements of due execution are made to appear the burden rests upon the contestants to go forward with their evidence, and show, if they can, incapacity at the date of execution; but this is not true where the draftsman holds a position of trust and confidence, where he himself is a major beneficiary and where the testatrix is sick and inclined to yield readily to persuasion. In such a case not only does the burden of proof not shift but the burden of producing evidence continues likewise unchanged.

"It is undoubtedly the law that when, by physical or mental superiority, one obtains an advantage in a transaction over another who is enfeebled in mind and body, or by disease or old age, the person obtaining such advantage will be required to show that the transaction was a fair one." 6 R. C. L., p. 638.

"The evidence may, however, show certain relations between the testator and the beneficiaries, well calculated

to give them an undue influence over him, or that his condition of mind or body was such as to make it probable that he was not able to resist the influence of others, or that the provisions of the will are unnatural and unreasonable, and contrary alike to his duty and his previously expressed intentions, and this evidence, without any other, may often create a presumption of undue influence, and cast upon the proponent of the will the burden of removing such presumption." Note, 31 Am. St. Rep. p. 681.

This principle appears in an instruction given in the late case of *Culpepper* v. *Robie, supra.* It reads:

"The court instructs the jury that if they believe from the evidence that at the time the will in question was made the testator, Nathaniel D. Culpepper, was an old man in the house of Benjamin Franklin Culpepper, and that Benjamin Franklin Culpepper stood in relation of confidence or dependence toward the testator, and that the will left all the property to Benjamin Franklin Culpepper, and differs from the previously expressed intention of the testator, it raises a presumption of fraud and undue influence, which should be overcome by satisfactory evidence before the will should be allowed to stand."

Mr. Justice Epes in a dissenting opinion thought that the expression "fraud and undue influence" was a little strong, but plainly good faith requires that claimants show that a will, executed under such circumstances of suspicion, was fairly executed. The burden of producing evidence to show this is upon them.

█ It is perfectly true that men and women should be permitted to make their own wills, but it is also true that they must represent their own purposes and not the purposes of others. In solving problems thus presented, no fixed rule can be formulated. As we have seen these matters are preeminently for the jury.

█ It is not one fact or one circumstance which controls our judgment but the cumulative effect of them all. They lead us to the conclusion that the verdict and judg-

ment assailed is neither plainly wrong nor without evidence to support it.

It only remains for us to inquire, if there were errors of law committeed during the progress of the trial.

Proponents offered fifteen instructions, five were given and ten refused. Exceptions were taken to each of these ten refusals. For the contestants twelve instructions were given and to each of them exceptions were taken.

We shall not undertake any detailed analysis but content ourselves with saying that we have examined them with care and find no reversible error. They fully and fairly submit the issue to the jury. No new propositions are presented and none need be discussed except instruction "M" given for the contestants. That instruction deals with the burden of proof, or more accurately with the question as to who must bear the burden of showing that this will, at the time it was executed, represented the wishes of the testatrix and was not executed under undue influence.

### *"Instruction No. M.*

"Undue influence is a species of fraud and fraud in general is never presumed. The burden of showing undue influence rests in general on him who alleges it and it cannot be based on bare suggestion, innuendo or suspicion. The undue influence which will vitiate a will must be of such a character as to control the mind and to direct the action of the testatrix.

"But in this case the evidence shows that, at the time of the making and signing of the alleged will, Julian W. Tyler occupied a relation of trust to Lillian A. Redford by virtue of the power of attorney which he held from her for the transaction of all of her business and by his undertaking to advise her in the conduct of her affairs, and the fact of this relation between them and his connection with the making and signing of the will and the substantial benefits which he and members of his family receive thereunder, raises a presumption in this case that

said will was the result of the exercise of undue influence by said Julian W. Tyler on said Lillian A. Redford, and casts upon the proponents of the will the burden of showing by a preponderance of the evidence that the will was fairly made and without the exercise by Julian W. Tyler of undue influence on Lillian A. Redford in the making and signing of said will.

"But this presumption may be overcome by any evidence in this case which satisfies the jury that undue influence was not in fact exercised, and whether this burden has been borne by the proponents is to be determined by the jury from all the facts and circumstances shown and by the evidence in this case."

To some extent we have already considered the issue here presented.

When one because of failing faculties puts the control of her affairs in the hands of another, authority thus vested is not to be used for selfish purposes. If in such circumstances this agent or trustee is asked to write a will, and if that will gives to him a substantial portion of that estate theretofore entrusted to him, explanations are in order. He is not oppressed when he is required to show good faith.

We have rightly said that undue influence is a form of fraud and must be proven by him who charges it, that fraud is never presumed. Neither is guilt presumed. The presumption of innocence goes with the accused throughout the entire case and applies at every stage thereof. Notwithstanding this presumption, however, when certain facts have been established, the burden of explanation is upon the prisoner. Where larceny is charged and where the accused is found in the exclusive possession of those articles recently stolen, he rests at his peril upon the presumption of innocence.

The cause of *Montague and wife* v. *Allan's Ex'r,* 78 Va. 592, 49 Am. Rep. 384, is helpful. Geo. W. Mayo drew a will for Mrs. Louisa E. Allan, an heir at law of the testatrix, executors and his wife appears as a large beneficiary.

Mrs. Genevive E. Allen, an heir at law of the testatrix, undertook to contest the will. There was an issue of *devisavit vel non* and a jury's verdict in favor of proponent. No exceptions were taken to instructions given, and so the court said that the law there laid down could not be questioned in that cause. It was contended that the circumstances noted raised a conclusive presumption against the validity of the paper. This contention the court did not sustain, but it did say that "such circumstances certainly engender suspicion and arouse the vigilance of the court and jury, and, if unexplained or repelled, they would annual the transaction." Who could explain them? Plainly that knowledge lay in the breast of the draftsman.

In *Hartman* v. *Strickler, supra,* we said:

"Where a will executed by an old man differs from his previously expressed intentions, and is made in favor of those who stand in relations of confidence or dependence towards him, it raises a violent presumption of fraud and undue influence, which should be overcome by satisfactory testimony." See also, *Whitelaw's Ex'r* v. *Sims,* 90 Va. 588, 19 S. E. 113; *Branch* v. *Buckley,* 109 Va. 784, 65 S. E. 652; *Broaddus* v. *Broaddus,* 144 Va. 727, 130 S. E. 794.

It is not necessary that we assume actual fraud, but this evidence plainly points to suspicious circumstances, and so the learned trial court rightly placed upon proponents the burden of explaining.

Proponents' contention finds support in certain expressions which appear in *Dearing* v. *Dearing,* 132 Va. 178, 111 S. E. 286, but what was there said must be read in connection with the facts in that cause. The testator was an old man. His nephew was the draftsman, executor and a beneficiary. His mental ability was established by the uncontradicted evidence of three physicians and other witnesses. He was a man of strong purpose of mind and was not easily influenced. After the will was written he submitted it for approval to counsel of high standing. The trial court sustained a demurrer to the contestants' evidence. In the light of these facts Instruction "M" could

not properly have been given in that cause. It is not authority here.

The conclusions which we have reached are elsewhere sustained by high authority.

"(1) The risk of jury-doubt as to undue influence or fraud by a beneficiary-grantee or legatee is on the party disputing the deed or will;

"(2) But the *confidential relation* of a beneficiary who has drafted or advised the terms in his own favor may by a ruling on the case be deemed decisive of fraud or undue influence." Wigmore's Code of Evidence, p. 507; Wigmore on Evidence, section 2503.

"By the civil law, where a person wrote a will in his own favor the instrument was rendered void, and in modern times the courts still view such conduct with disfavor and consider it a suspicious circumstance inviting close scrutiny, and requiring stricter proof of volition and capacity." 28 R. C. L., p. 145.

"It is the generally accepted view that the mere existence of confidential relations between a testator and a beneficiary under his will does not raise a presumption that the beneficiary has exercised undue influence over the testator, and does not cast upon the beneficiary the burden of disproving undue influence. Those consequences follow only when the beneficiary has been actively concerned in some way with the preparation or execution of the will." 28 R. C. L., p. 146.

*In re Barney's Will,* 70 Vt. 352, 40 A. 1027, 1033, the rule is thus stated:

"Where the relations between the testator and the proponent were confidential, and the proponent drew the will, taking the entire estate or a large bequest, and would have taken nothing as heir, while near, needy, and deserving relatives take nothing, then the law not only regards the transaction with suspicion, but the burden should be cast upon the proponent to show that he did not, nor did any one in his behalf, unduly influence the

testator, and that the instrument propounded is the testator's will, and not the will of another person."

"When confidential relations exist between two persons, resulting in one having an influence over the other, and a business transaction takes place between them resulting in a benefit to the person holding the position of influence, the law presumes everything against the transaction, and casts upon the person benefited the burden of proving that the confidential relations had been, as to the transaction in question, suspended, and that it was fairly conducted as if between strangers." *Pironi* v. *Corrigan,* 47 N. J. Eq. 135, 20 A. 218. (Syllabus).

See also, *Zeigler* v. *Coffin,* 219 Ala. 586, 123 So. 22, 63 A. L. R. 942; *In re Putnam's Will,* 257 N. Y. 140, 177 N. E. 399, 79 A. L. R. 1423; *In re Llewellyn's Estate,* 296 Pa. 74, 145 A. 810, 66 A. L. R. 222; *Richmond's Appeal,* 59 Conn. 226, 22 A. 82, 21 Am. St. Rep. 85.

How does this case differ from *Jenkins* v. *Trice, supra,* and from *Tabb* v. *Willis, supra,* so confidently relied upon by proponents? In the first cause it appears that Jenkins who was ill sent for Trice and told him that he wished to make a will. On that occasion Trice took notes of what was to be done and at his suggestion Miller, a skilled draftsman, was afterwards called in. Miller and Trice together visited Jenkins. Miller had notes which Trice had taken. Jenkins in the meantime had prepared other notes. And upon this occasion Jenkins dictated to Miller a third memorandum and it was from them that the will was drawn. Trice was named as executor, not sole executor but jointly with the First and Merchants National Bank and Trust Company of Richmond. Nothing was given to him, but $2,000 was given to each of his two sisters and $1,000 to his wife. They were the testator's double first cousins and his only double first cousins. At the hearing there was a sharp conflict of evidence as to testamentary capacity. A jury found for the will, its verdict was confirmed by the trial court and upheld by us.

In the *Tabb Case* it appears that Mrs. Brickhouse died

leaving as her heirs and distributees at law four sisters and the children of a dead brother. The will gave all of her estate to these children, three in number, one of whom was Mrs. Tabb, and one of whom was Mrs. Burgess. It named as her executors their husbands.

Mrs. Brickhouse asked Burgess to prepare a will for her. He refused and suggested that she get a lawyer to do this. Later she made the same request and he made the same reply. She became ill and went to the Burgess home, and again urged him to write the will. He advised her to wait until she was well, but she would not and so he made a rough draft or memorandum of her wishes. By chance he met Mr. Tabb and told him what had been done, and at Tabb's suggestion he gave that memorandum to him who took it to Mr. Portlock, an experienced draftsman. Portlock drew the will, Burgess took it to Mrs. Brickhouse, she read it over carefully, thanked him for his services and asked him to get Mr. Eanes and Mrs. Gay to act as subscribing witnesses, and so it was executed.

It further appeared that this disposition of her property was made in accordance with the wishes of her late husband, from whom it had in part come. Evidence of fair dealing and a testamentary capacity was overwhelming. There was a verdict and decree against the will which this court upon appeal set aside, being of opinion that it was plainly wrong and without evidence to support it. We think these two cases differ materially from that now before us.

The decree of the painstaking and able chancellor who presided is without error and should be affirmed. It is so ordered.

*Affirmed.*