# Richmond.

## W. Tilden Smith and Tulley D. Murden, Executors, v. Joshua J. Ottley and Others.

### March 18, 1926.

1. Appeal and Error—*Wills—Contest—Verdict of Jury Determines Conflict of Fact—Case at Bar.*—In the instant case, a will contest between testator's heirs and his executors, a special jury found that the paper offered for probate was not the true last will and testament of the deceased. The question at issue was the testamentary capacity of deceased.

   *Held:* That the verdict of the jury resolved all conflicts, if any, in favor of defendants in error, the heirs and distributees.

2. Testamentary Capacity—*Old Age—Presumptions.*—There is no presumption either of law or fact against mental capacity by reason of age alone. The presumption of competency is not destroyed by any extremity of age.

3. Testamentary Capacity—*Old Age—Evidence Held to Show Lack of Testamentary · Capacity—Case at Bar.*—In the instant case testator was seventy-five years of age when the alleged will was executed. He lived in seclusion with his house-keeper and kept about forty ferocious dogs; had numerous firearms and stated to one witness that he had "an arsenal with over a thousand rounds of ammunition and a dozen rifles." The testator, prior to the execution of the will, had had several cerebral hemorrhages, had been severely clubbed over the head, and had had an eye shot out. There was evidence tending to show lack of memory and delusions. Numerous witnesses, both lay and expert, testified to the mental incapacity of the testator to make a will. On the other hand, numerous witnesses testified that in their opinion testator was capable of making a will, among them the attesting witnesses.

   *Held:* That a verdict of want of testamentary capacity was not without evidence to support it.

4. Testamentary Capacity—*Weight of Testimony of Attesting Witnesses.*— While upon the issue of testamentary capacity the evidence of the attesting witnesses is entitled to great weight, it is not conclusive. A will may be set aside or established by evidence contrary to, and in the mind of the court overruling, that of the attesting witnesses. The question of sanity, like questions of fact, must be decided by testimony which preponderates.

Error to a judgment of the Circuit Court of Norfolk County, in a will contest. Judgment for defendant. Proponents assign error.

*Affirmed.*

The opinion states the case.

*Bruce Simmons, Tazewell Taylor* and *Wilcox, Cook & Wilcox,* for the plaintiffs in error.

*A. B. Carney, Jas. G. Martin & Bro.,* and *Pender, Way & Foreman,* for the defendants in error.

CAMPBELL, J., delivered the opinion of the court.

This is a controversy between Smith and Murden, executors named in the alleged will of Captain Frederick M. Holstead and thirty-two persons claiming to be the heirs at law and distributees of the deceased.

Captain Holstead, a citizen of Norfolk county, Virginia, was in his youth an officer in the Confederate army. He was a life-long resident of the community in which he died, and made his home from infancy on the ancestral estate known as "Cedar Grove." On the 15th day of April, 1918, he executed the paper involved in this litigation, and departed this life on October 8, 1924, at the age of eighty-one years. The death certificate, signed by Doctor Smith, one of the executors, states the cause of death: "Cerebral hemorrhage (duration) 6 ds. Contributory (secondary) *arterio sclerosis* and previous cerebral hemorrhage (duration) about six years."

On the 21st day of October, 1924, the purported will was, upon motion of the plaintiffs in error, admitted to probate by the clerk of the circuit court. From this action of the clerk an appeal was taken by the defend-

ants in error to the Circuit Court of Norfolk county. This appeal was tried by a special jury, which rendered the following verdict: "We, the jury, find that the paper dated April 15, 1918, and signed by Frederick M. Holstead, is not the true last will and testament of the said Frederick M. Holstead."

The will was written by Norman Cassell, an attorney, and witnessed by Cassell and Frank L. Crocker, also an attorney. Due to the length of the paper, it will not be set forth in full. The pertinent clauses of the paper, after providing for the burial of his body and the payment of any debts, are:

1st. That the executors shall set apart and dedicate as a cemetery a certain portion of ground, which shall be used as a place of interment for the remains of himself, his father, mother, uncle and aunt.

2nd. To Alice J. Jenkins is devised the dwelling house and furniture therein, together with six acres of land immediately surrounding the same, together with all outbuildings belonging thereto.

3rd. The executors are directed to lay out into lots, thirty feet by one hundred and five feet, the entire real estate of deceased, and sell same within a period of ten years, to white persons only, the whole of the survey to be forever known and called "Holstead City." The streets and avenues of this city were to be named for the deceased and certain deceased relatives.

4th. A direction to the executors to expend the sum of $2,500 in the erection of a monument, at Camden court house, in the State of North Carolina, to the memory of the members of Company B, Sixty-eighth North Carolina Reg., C. S. A., commanded by Captain Holstead.

5th. The sum of $2,500 was to be invested and the income derived therefrom was to be used in taking care of the family burial grounds.

The last pertinent clause of the paper is as follows: "I direct that all the rest and residue of my estate, including any and all moneys remaining in or coming into the hands of my executors, after carrying out the foregoing provisions of my will, or that may be derived from any and all sales or investments of any part of my estate, or of any funds that may revert to my estate, shall be completely and exclusively used by my executors, or their successor, or successors, and expended in defraying the original cost of constructing and erecting a monument to be known as 'The Holstead Monument,' which shall be located and erected in and upon the plot of land mentioned above in the second clause of this my will, in that part of my home farm known as the Cedar Grove, near by the family burial ground. The said monument shall be erected and stand as a memorial and debt of gratitude from me to said father, mother, uncle and aunt, and I direct that within the said monument there shall be constructed a vault or receptacle for the remains of my said father, mother, uncle and aunt, into which said vault their remains shall be removed from their present graves in the family burial ground and reinterred along with my own remains in the vault within said monument, as soon as practicable after my death. ·

"The design for said monument shall be made by a competent architect or builder selected by my executors, or their successor, or successors, and the work shall be done to their satisfaction, according to such plans and specifications as they may approve, and a bond with good security shall be required by them of the builder for the faithful execution and completion of the work. Bids for the construction of the monument shall be advertised to be received by them or their successor or successors, and the best bid for the

most suitable monument shall be accepted, and the work shall be done as soon as may be conveniently accomplished after my estate is converted into money.

"The monument now standing in the family burial ground over the remains of my uncle Matt B. Holstead, and aunt, Camilla Old Holstead, shall be removed by my executors, at the expense of my estate, to the plot of land on which The Holstead Monument is to be located, and are to be re-erected and to be attached to and made a part of The Holstead Monument. The said plot of ground shall be enclosed by a substantial ornamental concrete wall six feet high, encompassing the entire plot."

The sole ground upon which contestants rely to defeat the provisions of the paper writing is one of fact, namely, that Captain Holstead was mentally incompetent to make a will at the time the alleged will was executed. The efforts of the contestants were directed to showing that Captain Holstead was suffering from *senile dementia.*

In Rood on Wills, pp. 65, 66, we find this disease defined thus: "Dementia exists where a mind once sound has become weakened or decayed. Weakness of mind in consequence of old age is termed *senile dementia.* Like idiocy, dementia presents a question difficult to determine, not because the type is hard to recognize, but because it is hard in close cases to determine on which side of the line the case lies. In dementia we find a new difficulty in the ever increasing weakness. The loss is usually a gradual process, sense fading from the mind like the twilight of evening, till all is dark."

[1] There is no dispute as to the law governing the action this court should take as to sustaining the verdict rendered, provided there is sufficient evidence in the case to warrant such holding. *Palmer* v. *Showalter,*

126 Va. 306, 101 S. E. 136.   All conflicts, if any, have been resolved in favor of the defendants in error.

The record is a voluminous one, containing over six hundred printed pages, and setting forth in full the testimony of sixty-nine witnesses; therefore, we will not attempt to analyze the evidence offered by the plain- tiffs in error.   The evidence offered to sustain the charge of mental incapacity is that of both expert and nonexpert witnesses.

[2] The alleged will was executed when Captain Holstead was seventy-five years of age.   This fact of itself is not significant.   Some of the most active and virile minds are possessed by men who have attained the age of seventy-five years and more.   There is no presumption either of law or fact against mental capa- city by reason of age alone.

In *Wooddy* v. *Taylor,* 114 Va. 737, 77 S. E. 498, Judge Harrison said: "As to the charge of mental incapacity, it is said in Robertson's Old Practice, Vol. 3, p. 337, that 'the presumption of competency is not destroyed by any extremity of age.   *Browne* v. *Molliston,* 3 Whart. 137.   Nor is incompetency established by proving that the mind has been impaired by disease. *Tompkins* v. *Tompkins,* 1 Bailey (S. C.) 92, 19 Am. Dec. 656.   It is not necessary that the testator, at the time of making his will, should retain all the force of intellect which he may have had at a former period. If he be still possessed of mind sufficient to comprehend and advise as to the ordinary transactions of his life and to give directions how his business shall be con- ducted and his estate managed, he may be considered competent to make a will disposing of his estate. Kennedy, J., in *Kachline* v. *Clark,* 4 Whart. [Pa.] 320; *Temple, etc.* v. *Taylor,* 1 Hen. & Munf. [11 Va.] 476. Those who would impeach the will on the ground that

the decedent had become incompetent, must clearly prove that incompetency to exist.' "

[3] It, however, appears from the record that the testator (as he will hereafter be called) had lived on his farm in Norfolk county, with Miss Jenkins, his housekeeper, for years, in comparative seclusion; that he kept about forty ferocious dogs, some of them so fierce that they had to be fed by pushing their food to them with sticks; that he had numerous firearms and stated to one witness: "In that little room on the back I have got an arsenal with over a thousand rounds of ammunition and a dozen rifles;" that in the year 1905 testator had an eye shot out; that in 1914 he was severely clubbed over the head by a negro; that, prior to the execution of the will, he stated that he had a "stroke," meaning that he had a cerebral hemorrhage; that again in 1920 he had another hemorrhage, also in 1922 and 1924; that in 1917 he was visited by Captain L. W. Lambert, a produce dealer, living in Norfolk, who testified as follows:

"Q. After that time did you go back to Captain Holstead's home?

"A. In 1917 he dug some potatoes, and Mrs. Wilson said to go up there 'and you might get them.' I said: 'I don't want to have anything to do with Mr. Holstead. He has told me he would shoot me on his farm,' but those potatoes were shipped to me and I sent Mr. Holstead his check and account of sales.

"Q. You handled them as produce merchant?

"A. Yes, sir.

"Q. To whom did you ship those potatoes?

"A. Smith and Holder.   *   *   *

"Q. When, if at all, did you see anything or hear anything more about that transaction, Capt. Lambert?

"A. About six months and two days they sent word

for me to come to Mr. Holstead's, that he had my note and I told him he didn't have it.

"Q. Did you go to his place?

"A. I, went down to his place.

"Q. Tell what happened, the whole thing, at that time.

"A. I went up to his place and there was a lady there then that had on gum boots and overalls, a red sweater and a slouch hat, and I asked her could I see Mr. Holstead, and she went to the house and came out and he came out and I told him: 'This is Captain Lambert, I want to know something about the note.' I said: 'You haven't got any note of mine,' and he said: 'Are you going to pay interest on it?' and I said: 'No, I am not going to pay any interest on it,' 'Am not going to pay the note.' He said: 'I have got one for J. P. Lambert. He owes me one for $500.00 and I want interest on it.' I said: 'I don't know what you have got of him, but you haven't got one of mine.' I said: 'If you will let me see it and anybody has forged my name to it I will attend to it.' He said: 'I will give this to Mr. Broudy, Lawyer Broudy.' I didn't know who the gentleman was; I said: 'Well, it will be all right,' and I said: 'If you will let me see it I will see if I can straighten you out,' and he took it out and it was Smith & Holdern's check for those sixty-three barrels of potatoes. I said: 'That is a check that is good in any bank,' and he held this other one out and I said: 'That is Joe Lambert's and that is good.'

"Q. He said Joe Lambert's check was a note?

"A. Yes, sir; and he wanted him to come and take it up or pay interest on it, and he reached his hand up and said: 'I will attend to it,' and he said: 'I will turn loose my regiment.'

"Q. Was this in Captain Holstead's presence?"

To which this witness answered:

"Yes, sir; he went to the house and went in and come out and had his gun, and he set his gun alongside of the steps, and I thought to myself, here will be trouble, but he left it there, and he ripped a stick off the gate about that wide, and I thought all the dogs in the world had come out; and he had them from a little poodle dog up as big as a calf; and the gate post was about eight feet tall, and I thought that was the best thing for me to go up, and this woman drove the dogs away and I got in my machine, and I went off and that is the last I had anything to do with Captain Holstead.

"Q. On that occasion when you saw him and his conduct, and from what you observed at that time, would you consider Captain Holstead a man of balanced and sound mind, or otherwise?

"A. I thought at that time that he was the craziest man I ever saw."

It further appears that this occurrence took place on December 29 or 30, 1917, three months before the execution of the will; that also, in the year 1917, he was visited by Rev. O. D. Poythress, who testified that testator "would not connect up his chain of thought," and that he was not in a mental condition at that time to transact any business; that C. A. Rhodes, a witness, testified that in 1915 testator would get up in the middle of the night and fire off guns for no apparent reason; that he was unable to remember recent matters, but could remember about the Civil War; that Mrs. Rhodes testified that "Mr. Holstead didn't seem to be, mentally, in 1915, what he was when I knew him before, * * * He didn't seem to remember any recent dates. For instance, if any-

body would come out to see him on Tuesday probably the next day he would say to me: 'Annie, what day was it Mr. So-and-so came here?' When we would get up in the morning he would say: 'Is to-day Monday?' and I would say: 'No it is Wednesday,' and he would say: 'Go on. You know it is Monday,' and he would miss every day, and would ask us what the day of the week was. \* \* \* And he said: 'Alice (Miss Jenkins) is gone and things are going to the dogs, and this winter if I go to Florida I want you to saturate this old'——his place, but not the Matthew Holstead place, 'with oil and burn it, and you will do me a favor.' "

C. S. Cutherell testified that, in 1915 or 1916, he met testator, who, speaking seriously, "said he wanted to know if there were any Yankees pillaging on his place;" K. P. Butt, one of the heirs, testified that his grandmother, Mary Old Butt, was a sister of Holstead's mother, and also a sister of Matthew Holstead's wife, Camilla; that ever since he could remember witness had known Holstead; that his father visited Holstead, and his father and Holstead called each other "cousin"; that in 1906, as a young man, witness had lived in Holstead's house ten days and slept in the same bed with Holstead; that Holstead gave him a running horse and gave him a pony; and used to give him different things. Witness said that in 1920 Holstead sent for him and he went to Holstead's house and Holstead asked him: "How is Cousin Melissa?" He told him she had been dead fifteen years. And then he asked him how was his father, and he told him his father had been dead eight years.

"Q. All right; go ahead.

"A. And then he started and talked about different things, and all at once he told me, he says: 'You are cutting timber on my land.' And I told him: 'No,

sir; I never cut a stick of timber on your land.' And he said; 'I know you have.' I said: 'No, sir; I have not. I have never cut any timber on your land at all.' So, he got mad and he used all kinds of language. I never felt so bad in my life. I have never been caught in such a place. I was there and he cursed me to everything he could think of. Miss Jenkins was sitting across right in front of him, and she spoke up and she said: 'Mr. Holstead, he has not cut any timber on your land at all.' And then he turned off me and jumped on her and he just cursed her like he did me, and told her she didn't have anything in the world to do with his business and he wanted her to keep her mouth shut, but he used a curse word every word. He picked up something at his side, I don't know what it was, and threw it over at Miss Jenkins. * * It was a pistol that he could have got his hand on and I am not sure, but he was sitting close to the corner and he was between me and the door. I could not get out, and there was a rifle and a shot gun, I am sure, sitting up in the back corner as the door opened, and his chair was not over two feet from the corner. * * * As soon as I could I got out, I told him I had somebody waiting for me at the road and I got out just as quick as I could. And I got up and come out and Miss Jenkins came out with me; as I got to the door he called me by my name, asked me to have dinner with him. * * * He called me Ken, and he said; 'Ken, stay and eat dinner with me. You haven't had dinner with me for a long time.' But I never stopped. I was glad to get away.

"Q. When he threw this object at Miss Jenkins, what was her attitude? Did she seem a little bit flustrated?

"A. Yes, sir; but I think she was used to it."

The record further shows that Miss Corine Fister, assistant superintendent of the Norfolk Protestant Hospital, identified and put in evidence the record kept under the direction of Executor Dr. Smith, which is, in part, as follows: "F. M. Holstead, farmer, Norfolk county, about two years ago, was paralyzed on left side, unconscious for several days. Several months before could walk very well, about one or one and one-half years later had a similar experience but not so severe, five or six years ago was struck on head by a negro and knocked down. From which he did not entirely recover for several weeks. High blood pressure for the past six or eight years.  *  *  *  Accidentally shot in left eye twelve or fifteen years ago. Sight entirely lost. Has not been well since first paralyzed about three years ago. Since that time his mind has been slightly impaired. At times very bad. W. Tilden Smith."

Numerous other lay witnesses testified as to the mental incapacity of the testator to make a will.

It also appears from the record that though Miss Alice Jenkins was a party defendant, was summoned as a witness, and was present during the trial of the case, she was never called to testify. This fact is most significant. No doubt the jury—as they had the right to do—drew the inference that the testimony of the daily companion of the testator, for many years, had she testified, would have been against the contention of the plaintiffs in error.

It is also significant that the attorney who had attended to testator's legal matters for years, though present in court, and of counsel for plaintiffs, was not called as a witness on the question of testator's mental capacity.

Dr. F. H. Redwood, a witness for the defendants

in error, testifying as an expert on nervous and mental diseases, was asked this hypothetical question:

"Q. Doctor, suppose the man we are talking about was in a sanitarium for two weeks in December, 1919, where his trouble was diagnosed as *arterio sclerosis*. He was suffering with his head and stated he had vertigo. His blood pressure was 190. He had a cerebral hemorrhage in April, 1920. He had another cerebral hemorrhage in June, 1922. In August, 1922, he was seen by Dr. Strickland and found to be suffering from senile dementia. He died of another cerebral hemorrhage in October, 1924, at the age of eighty-one and this man made his will, a copy of which you said you read, on April 15, 1918. Can you give us your professional and expert opinion as to whether that man was of sound mind when he made that will on April 15, 1918?"

His answer was?

"A. Considering those facts, in my opinion, in all probability he was not of sound mind; considering the facts which you have read to me."

Dr. Harry Bybee testified that testator had been a patient in his chiropractic hospital in the year 1919. In answer to the question: "What history did he give you in that connection?" He stated: "At the time he called at the office he told me he wanted to go into the sanatorium for a while and said that he was suffering with vertigo and that he was having spells of blankness, that he would lose his memory."

The witness further testified: "I did not examine him at that time, but he came into the sanatorium the first of December, 1919. On examining him at that time his blood pressure was 190, and I, of course, suspected that from the history that he gave me and my diagnosis I felt I was absolutely correct in so far

as the *arterio sclerosis* was concerned, and the confusion and trouble he was having with the head was due to the hardening of the arteries. We accepted him as a patient and I watched him carefully and gave him the treatments, but due to the fact of his age, etc., at the end of two weeks I told him there was nothing else I could do. He gave me a history also that he had had a stroke, a light stroke, previous to this time and he was afraid he was going to have another one.

"Q. What was his general mental condition at the time he was at your sanatorium, Doctor?

"A. There was no question in my mind but that his brain was diseased, due to the *arterio sclerosis.* He was very peculiar and he would know me one time and another time he would come in and would not know me. I would meet him outside on the sidewalk, in the yard, and he would not know me. And he had a general confusion that a man would have suffering from *arterio sclerosis.* The brain was confused and the blank spells he was having, as he complained of, was due to the high blood pressure, and he was bordering, I think, on another stroke.

"Q. Would you say at that time he was a man of sound mind or insane mind?

"A. Certainly he did not have a sound mind. My opinion was his brain was diseased at that time, that was the time he came into the sanatorium."

Dr. J. A. Strickland, a specialist, who conducts a sanatorium for the treatment of nervous and mental diseases, testified that at the instance of Dr. Smith, he went to the home of the testator in August, 1922, for the purpose of observing his mental status. Upon arrival, he was shown "a hole shot through the side of the house with a shot gun, the whole load went

through the screen, the window and the blind." Testator told him he fired the shot at some one who was disturbing him. Asked the question: "From your observation, Doctor, based on your experience as a specialist in nervous and mental diseases, and your conversation with Mr. Holstead at that time, from what ailment was he suffering?" Dr. Strickland answered: "He was a senile dementia." This witness further stated that in the ordinary course of events, when senile dementia begins at all, it is usually when the person is around sixty-five years of age; that he could not say testator was incompetent in 1918, but that the disease was a progressive one.

Dr. L. C. Ferebee stated he had known testator many years; that in 1917 he went to see him with reference to a farm, but after talking to him for some time he decided that the mental condition of testator was such that he was incapable of making a valid deed.

Defendants also introduced evidence which tended to show that the creation of "Holstead City" was impracticable; that the lands of testator were located near negro settlements and were not suited for residential purposes.

The plaintiff in error introduced numerous witnesses who testified that, in their opinion, testator was perfectly capable of making a will in 1918. Among the witnesses who thus testified were Mr. Cassell and Mr. Crocker, one of whom wrote and both of whom witnessed the alleged will.

[4] It is contended with unusual force that "the testimony of witnesses who were present at the time the will was made is more to be relied upon than the opinions of other witnesses who were not so present." While it is true that such evidence is entitled to great weight, it is also true that it is not conclusive.

In *Spencer* v. *Moore*, 4 Call (8 Va.) 423, with reference to the weight to be given to the testimony of attesting witnesses, Judge Roane said: "There is nothing more clear, than that a will may be set aside or established by evidence contrary to, and in the mind of the court overruling, that of the attesting witnesses. The question of sanity, like other questions of fact, must be decided by testimony which preponderates."

The case has been fairly submitted to a jury; a verdict has been rendered upon legal and ample evidence to support it. The great consideration to be given to the verdict of a jury, when the same has been approved by the trial court, is so deeply rooted in our jurisprudence that only a legislative enactment can uproot it.

We are of opinion, from what has been said, that the judgment of the trial court should be affirmed.

*Affirmed.*