# Staunton

H. B. Ferguson v. C. M. Ferguson, et als.

September 23, 1937.

Present, Campbell, C. J., and Holt, Hudgins, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*S. H. Bond* and *M. M. Long,* for the appellant.

*Warren & Cantwell,* for the appellees.

SPRATLEY, J., delivered the opinion of the court.

This suit was instituted on the 12th day of July, 1935, by C. M. Ferguson, A. L. Ferguson and Martha Fletcher against Thomas Smith, H. B. Ferguson and W. S. Ferguson, for the purpose of contesting the will of Ida J. Ferguson, deceased, which had been admitted to probate *ex parte* before the clerk of the Circuit Court of Scott county. W. S. Ferguson was the husband of the late Ida J. Ferguson and the other parties were her children. At the time of her death, Mrs. Ferguson and her husband owned a farm of one hundred and thirty acres, worth between twenty-five hundred and three thousand dollars, and, in addition, a life estate in seventeen acres of land.

She died on December 8, 1933. On December 5th, three days before her death, together with her husband, she executed a joint will disposing of the property of both. It bequeathed to Martha Fletcher five hundred dollars, to T. M. Smith one hundred and fifty dollars, to C. M. Ferguson and A. L. Ferguson one dollar each, and to H. B. Ferguson the remainder of their personal property, including the one hundred and thirty acre farm, with the proviso that the latter was to pay all of the funeral expenses and other indebtedness of the testators, including the first two of the above bequests, and should properly provide for his parents during their lifetime. The names of J. G. Gray and Mrs. Lucy M. McConnell appear as attesting witnesses, and the signature of Ida J. Ferguson was made by her mark.

This paper writing, after being proven by the subscribing witness, Gray, was admitted to probate on January 3, 1934. No appeal was taken from the clerk's order of probate. No bill was filed to impeach the will until the institution of this suit, eighteen months and nine days after the date of the order of probate.

The bill alleged that the testatrix, Ida J. Ferguson, was afflicted with such a sickness of mind and body that she did not have sufficient mental capacity to execute a true last will and testament, and that undue influence was used to obtain its execution. It sought to have the order admitting it to probate set aside and vacated, and the paper writing declared not to be the true last will and testament of Mrs. Ferguson. H. B. Ferguson and W. S. Ferguson filed a plea of the statute of limitations, upon the ground that the action had not been brought within one year from the date of the order of probate. They also filed an answer denying the allegations of the bill, to which there was a general replication. The trial court sustained the motion to strike the plea of the statute of limitations, on the ground that the statute in force at the time of the order of probate allowed two years within which to institute the suit. The cause was then submitted to a jury upon an issue *devisavit vel non.* Upon this issue, the jury found that the paper writing was not the true last will and testament of Mrs. Ferguson. This verdict was approved by the trial court, and a final decree was entered setting the will aside, and finally disposing of the case, from which decree H. B. Ferguson, a surviving son and chief beneficiary, applied for and obtained this appeal.

The first ground of error assigned is to the action of the trial court in refusing to sustain the plea of the statute of limitations. The plaintiff in error relies upon Virginia Code 1936, section 5259, as amended by the General Assembly in 1934, ch. 339, fixing the limitation at one year within which a bill in equity may be filed to impeach a will. Before the amendment of section 5259, and on the day of probate of the will in question, this section allowed two years within which the bill could be filed. The

amendment simply changed the time of the limitation from two years to one year. There is nothing in the language of the amended statute to declare or to indicate that the legislature intended to give to it a retroactive operation.

In the chapter discussing the principles governing the construction of statutes of limitations, 17 R. C. L. pages 682-4, section 28, it is said:

"One rule for the construction of laws is that statutes of limitation are presumed to be prospective and not retrospective in their operation, in the absence of a clear legislative intent to the contrary, and the presumption is against any intent on the part of the legislature to make such a statute retroactive. It has been said that words of a statute ought not to have a retrospective operation unless they are so clear, strong and imperative that no other meaning can be annexed to them, or unless the intention of the legislature cannot be otherwise defined. All authorities appear to approve of the rule that statutes will be presumed to have been intended by the legislature to be prospective and not retrospective in their action where a retrospective effect would work injustice and disturb rights acquired under the former law. * * * Some courts take the view that since limitation laws apply only to the remedy, they are not within the principle that statutes should be given a prospective rather than a retrospective construction, etc. * * * The rule under consideration is not everywhere recognized. * * * Occasionally the laws of a State provide statutory rules for the construction of statutes. Thus, it may be expressly declared by the legislature that no law shall be considered to repeal a former law, whether such former law is expressly repealed or not, as to any right accruing under the former law. A provision of this character will govern the construction of limitation statutes."

The general principle has been given statutory approval in Virginia. Our legislature has expressly declared in Virginia Code 1936, section 6, a rule of construction for all new statutes, as follows:

"No new law shall be construed to repeal a former law, * * * as to any act done, * * * or any right accrued, or claim arising under the former law, or in any way whatever to affect any such * * * act so committed or done, * * * or any right accrued, or claim arising before the new law takes effect; save only that the proceedings thereafter had shall conform, so far as practicable, to the laws in force at the time of such proceedings; * * * ."

While the plaintiff in error cites no authority in support of his contention, cases may be found holding that where the amended act relates to questions of remedy merely, it may be considered as having a retrospective operation. A distinction is made in these cases between those involving remedy alone and those which involve a combination of right and remedy, and such holding is not applied to the latter class. In many of these cases, however, the courts have pointed to the language of the statute, or to the circumstances surrounding its adoption as evidencing the intention that it should have a retrospective effect.

In *Allen* v. *Mottley Construction Company,* 160 Va. 875, 170 S. E. 412, this court held that the language of the amended act plainly showed that it was intended to apply retroactively. In that case, the amendment of the statute under review provided a limitation of time within which the review could be had, whereas there was no limitation whatever in the former statute, as distinguished from the case under review in which the limitation in the former statute had been decreased by an amendment thereto. While the opinion in that case refers to quotations from other cases, which make the broad and general statement, that where statutes affect a remedy they are uniformly held to be retroactive, we do not believe that the statement of such a rule is in accord with majority opinion. Nor, as we have seen, was the application of the quoted rule necessary to the decision in that case.

There appears to be no good reason for excluding statutes of limitation, or remedial statutes, from the general rule, that retroactive or retrospective legislation is not

favored, in the absence of any words expressing a contrary intention. Undoubtedly, the legislature may declare a statute dealing with remedial legislation, or one not affecting vested rights, to have a retroactive operation. It is reasonable to conclude that the failure to express an intention to make a statute retroactive evidences a lack of such intention. Otherwise, the hardship and injustice resulting in the application of any other rule is apparent not only in the instant case, but in other conceivable instances. It is not to be presumed that the legislature intends to work an injustice.

A great majority of opinion, and we think the better opinion, applies the same rule of construction to new or changed provisions of statutes of limitation that it applies to the construction of other statutes. In following this rule, the new enactment is held to apply to all rights or causes of action after its passage, leaving all rights or causes of action existing at the time of such passage subject to the operation of prior limitations, unless otherwise provided. Therefore, rights accrued, claims arising, proceedings instituted, orders made under the former law, or judgments rendered before the passage of an amended statute, will not be affected by it, but will be governed by the original statute, unless a contrary intention is expressed in the later statute. *Day* v. *Pickett,* 4 Munf. (18 Va.) 104; *Duval, Adm'r* v. *Malone, et al.,* 14 Gratt. (55 Va.) 24, 28; *City of Richmond* v. *Supervisors of Henrico County,* 83 Va. 204, 213, 2 S. E. 26; Limitations of Actions, 37 C. J. 691; Statutes, 59 C. J. 1181 (b).

Citing numerous Virginia and West Virginia cases and text book authorities in support of the above principle, it is said in the syllabus by the court in *State* v. *Mines,* 38 W. Va. 125, 18 S. E. 470:

"Statutes of limitations are no exceptions to the rule that statutes are *prima facie* to be given only prospective operation."

Code, section 5259, confers both a right of action and a remedy. Upon the probate of the alleged will on January 3, 1934, a right accrued to persons affected thereby, to as-

sert their claims thereunder, or to file, within two years, a bill to impeach it. The bill herein was filed within that period.

As was said by Judge Burks, in the case of *Price's Ex'r, et als.* v. *Harrison's Ex'r, et als.,* 31 Gratt. (72 Va.) 114:

"By the terms 'right accrued or claim arising,' could hardly have been intended rights and interests so vested as to be beyond legislative interference, for as to these no saving was necessary; but such rights and claims must have been intended as might be affected by ordinary legislation."

The right to bring this action seems to be such a right as is defined in Code, section 6, *supra,* where the general rule for the construction of new statutes is given statutory approval. In the exercise of the right conferred by Code, section 5259, as of January 3, 1934, and preserved by Code, section 6, the proceedings herein have conformed to the law in force at the time of such proceedings.

There was no error in striking the plea of the statute of limitations.

No new principles of law are involved in this case. We have before us only a new set of facts, upon which to apply well founded principles of law. The books and authorities abound in cases defining what constitutes testamentary capacity and what constitutes undue influence. We will content ourselves in simply referring to these principles as set out in the following Virginia cases: *Redford* v. *Booker,* 166 Va. 561, 185 S. E. 879; *Jenkins* v. *Trice,* 152 Va. 411, 147 S. E. 251; *Smith* v. *Ottley,* 144 Va. 406, 132 S. E. 512; *McComb* v. *Farrow,* 128 Va. 455, 104 S. E. 812; *Lester's Ex'r* v. *Simpkins,* 117 Va. 55, 83 S. E. 1062, and *Chappell* v. *Trent,* 90 Va. 849, 19 S. E. 314.

The principal question here is whether, under the peculiar circumstances of this case, Mrs. Ferguson at the time of the signing of the will, possessed a mind and memory sufficiently free and active to know the particulars of the business being transacted, perceived its obvious nature, extent and effect, and, with a rational judgment, approved thereof; or whether the provisions and terms of the instru-

ment were the will of another imposed upon her when she was too weak, physically and mentally, either to initiate, resist, or approve what was being done.

It is well settled that mere weakness of understanding, mere old age, or sickness, are neither of themselves sufficient to show mental incapacity. It is equally well settled that extreme old age, weakness of mind, serious and disabling physical illness, may be a badge of fraud, especially where such circumstances concur with circumstances of suspicion. These latter circumstances form a nucleus about which other facts and indications of undue pressure may be grouped. Whether under such circumstances, the influence is of such a nature as to overcome the will and control of the testator, depends upon the circumstances of each case. *Fishburne* v. *Ferguson's Heirs*, 84 Va. 87, 4 S. E. 575; *Long* v. *Harrison*, 134 Va. 424, 114 S. E. 656; *Redford* v. *Booker, supra;* 6 R. C. L. 638 and 28 R. C. L. 139, 145.

While it may not be necessary for a person to initiate the making of a will, it is necessary that the testator have sufficient strength of mind to understand, to appreciate, or to approve the terms and provisions thereof however initiated. If the acts of one destroy the free agency of the mind, or so control and direct the mind of another without giving effect to the wishes of that other, then what is done cannot be said to be the will and desire of the person controlled.

Although a testator may be under no legal incapacity to do a valid act, yet, if the whole transaction, taken together with all of the facts, mental weakness being one of them, shows that the particular act was not attended with the consent and will of his understanding, the act is invalid. *Greer* v. *Greer*, 9 Gratt. (50 Va.) 330.

The record discloses that it was the effort of the contestants of the will to show that it was not executed by the free agency of the testatrix; but that instead it represented the wishes and desires of another, who imposed and forced its execution and provisions upon a mind too weak to resist

or approve. There was never any contention that the testatrix was insane, or *non compos mentis,* but it is contended that she was in such a weakened physical condition that she did not possess enough physical energy to permit the mind to be active and free of control.

With the above contention and the general legal principles in mind, it is necessary to consider whether there was sufficient evidence upon which the jury could base its verdict.

Mrs. Ferguson was seventy-seven, or more, years of age, sick and half-blind. Ravaged by the infirmities of old age and failing health, she was confined to her bed by a cold on December 1, 1933, which had developed into pneumonia by December 5th. Living in the same home with her were her husband, W. S. Ferguson, and an unmarried son, H. B. Ferguson, the plaintiff in error, who had been living there for the past seven years. Her physician was Dr. Vernon Quillen, who had known her for thirty years, or more, had occasionally visited her, and had been attending her in this illness. On December 5th, she was physically very weak. She could barely talk and said little. She was in considerable pain and distress, and it was difficult to move her without greatly disturbing her. The members of her family and her neighbors were anxious about her, and were gathered in the home awaiting the final end, which came on December 8, 1933. On December 5th, after ministering to his patient, and diagnosing, for the first time, her illness as pneumonia, Dr. Quillen started to leave. H. B. Ferguson called him back from the front gate, and told him that his mother had been intending for some time to make a will, stated to him the terms thereof, and asked the doctor for his assistance. The doctor replied: "If that is true, you had better be doing it because she is all right now,. tomorrow may be too late." The two returned to the house, and the son took charge of the proceedings. He asked his mother if she wanted "to fix up her business," to which she replied, "I have been wanting it done. How will we fix it?" H. B. Ferguson then testified that he said, "Like we have been talking, like you have been talking, Tom one hundred dol-

lars," to which he said she replied, " 'Tom one hundred and
fifty dollars and Martha five hundred dollars,' " and "me to
have the rest of the property." Dr. Quillen recalled only
that Mrs. Ferguson said, "I want Tom to have one hundred
and fifty dollars," and then added that he thought that seem-
ed to be "the essence of the will and there was not much more
said about it." The doctor, pleading a lack of knowledge in
drawing wills, suggested a lawyer, but the son instead se-
cured a local merchant, J. G. Gray, one of the attesting wit-
nesses, to whom he also stated his mother's intentions about
the distribution of her property. Gray brought with him
some sheets of paper, a pen and ink, and returned with the
son to the sick room, where there were gathered, in addi-
tion to the doctor, Mrs. Lucy McConnell, two other sons of
the testatrix and her husband. After Gray started to write
the will, he became nervous, and Dr. Quillen took up the writ-
ing and completed it, Gray dictating the heading, and H. B.
Ferguson the provisions with reference to the distribution
of the property. Mrs. Ferguson does not appear to have
been consulted further as to the terms of the instrument.
Mrs. McConnell, the other attesting witness, left the room
while the will was being drawn, and only returned after it
had been signed by W. S. Ferguson, and before it had been
signed by Mrs. Ferguson. It was suggested during the
drawing of the will, as a reason for originally omitting the
other sons, that the parents had heretofore provided for
them. To this these sons did not agree. Gray suggested
that to make the instrument lawful, these two sons should
be left one dollar each, and this was added in the will, not-
withstanding a slight protest from H. B. Ferguson; the
mother apparently not being consulted in any way about it,
nor as to any other specific distribution, except as to the
amount to be given to Tom Smith and Martha Fletcher.
Gray stated that he read the paper to Mrs. Ferguson after
it was written; but that he was a little deaf, and did not
hear her say anything about it. He further stated that he
did not hear Mrs. Ferguson tell him, or anyone else, what
provisions the will was to contain; and that he did not hear

her acknowledge it, nor did he hear her ask anyone to witness her signature or mark. After W. S. Ferguson had signed the instrument, Mrs. McConnell was called in from an adjoining room to act as an attesting witness, and the writing was offered to Mrs. Ferguson for her signature. Being unable to see clearly, her glasses were secured and she was propped up in bed. The paper was placed in her trembling hands, but she was unable to see the correct place to sign, or to make her signature. Her mark was then secured by having her name written by Gray, who held her hand. The testatrix, during this operation, made no statement to anyone.

The doctor testified that at the time of the execution of the instrument he thought Mrs. Ferguson's mind was good; but that she never, in his presence, stated how she wanted her property disposed of, nor did she initiate the will or its terms. He admits that he subsequently said, and still had the impression, that it was possible undue pressure might have been exercised in making the will on account of her weakness. This impression was made on him, he also admits, at the time of its execution. Another witness testified that when it was found impossible for the old woman to sign her name to the paper, and "after they had kept drawing her hand back down for her to sign," H. B. Ferguson said, "Mr. Gray, just take the pen and sign her name." The attesting witness, Gray, agreed that he didn't think that she was out of her mind; that when the will was proved by him for probate, he simply meant to say that her mind was good, although he did not know whether or not she was competent to make a will; and that he was simply trying to be helpful to the parties and thought nothing wrong was being committed. He further testified that Mrs. Ferguson was "helpless physically," and that "she was mighty sick, looking like too sick to do any business," and that she seemed not to notice what was being done, not giving any indication that she did know, or saying anything. The other attesting witness, Mrs. McConnell, thought Mrs. Ferguson was in her right and proper mind at the time of signing. In the main,

she largely agrees with the method used to secure the mark or signature.

In addition to the doctor and the attesting witnesses, there were other witnesses, including the other relatives, friends and neighbors. Two, who were friends and neighbors of the deceased and had known her all of their lives, and had seen her about the time of the execution of the will, testified that she was "a very sick woman" and "too sick to transact business"; that she paid no attention to them while they were in the room, or to the conversation then going on; that they thought she did not even know them; and that she was too sick for them to speak to her, but that they did not know her mental condition. A number of other witnesses testified that they had known the deceased, had been friendly with her for years, and they thought that she was of sound mind and competent to make a will. The testimony of the father and the son, H. B. Ferguson, was that the will expressed the wishes and intentions of Mrs. Ferguson made on many former occasions, while other witnesses testified that prior to her illness, she had stated that she wanted all of her children to have equal shares in her property, and her only reason for delaying the making of a will to that effect, was that she was unable to get her husband to join with her.

After the introduction of this evidence, the proponents of the will offered twelve instructions, ten of which were given, one of them being amended by the court; and nine instructions were given at the request of the contestants.

The assignments of error set out certain objections to the giving, refusing, and amendment of the offered instructions. The other assignments of error relate to the admission of, or to the refusal to admit evidence, and the refusal of the trial court to set aside the verdict of the jury.

One assignment of error had to do with the admission of non-expert testimony, expressing an opinion as to the mental capacity of the testatrix. While the record discloses such an exception was taken, it also discloses that the plaintiff in error was permitted to examine witnesses in his behalf by asking questions eliciting such opinions

from favorable witnesses. A review of the evidence objected to, however, further discloses that these witnesses expressly admitted they could not speak as to the mental capacity of the testatrix; but that having known her for many years and having seen her at the time of the execution of the instrument, they believed from what they saw that she was a very sick woman and too sick to transact business. They justified this statement from their prior knowledge of the woman, whom they had known all of their lives and from the further fact that on the occasion in question, she paid no attention to either of them, nor to the conversation in the room and apparently did not know they were there.

The testimony of lay witnesses is of little value, except to state facts. Since lay witnesses may not always be able to convey adequate ideas of appearances, they may, after stating facts or particulars that they remember, be permitted to sum up all of their impressions, remembered and unremembered, by giving an opinion produced by such impressions. They may sum up their impressions as to particular facts and as to evident conditions appearing before them. Their testimony is admissible for such weight and consideration as the jury thinks it entitled to, based upon the facts related. The objection affects the weight of the testimony rather than its admissibility. *Thornton* v. *Thornton's Ex'rs,* 141 Va. 232, 126 S. E. 69; *McComb* v. *Farrow, supra; Hopkins* v. *Wampler,* 108 Va. 705, 709, 62 S. E. 926; *Forehand* v. *Sawyer,* 147 Va. 105, 136 S. E. 683; and *Smith* v. *Ottley, supra.*

 Assignments of error numbered three and five, to the giving of certain instructions, are not well taken. The record shows that in one instance, no objection was made to the instruction at the time it was given, and in the second instance, no ground was given for the objection in the trial court nor any assigned in the petition.

██ Assignment of error number four, to the giving of another instruction, cannot be considered, because the reason assigned in the petition is different from the one offered in

the record. The instruction, however, has been given, and approved in other cases by this court.

The next assignment of error is that the court amended the following instruction eight, by striking out the words "measure the capacity of persons nor":

"The court instructs the jury that the courts do not measure the capacity of persons nor examine into the wisdom and prudence of a person in their property dispositions. If one be legally *compos mentis,* he is legally sane, he is the disposer of his own property and his will stands for reason of his action. An unequal disposition of his property by a mother among her children does not indicate mental incapacity."

■■■ The cases cited to support this assignment of error have allowed or approved instructions containing the above phrase, where either the question of insanity or mental capacity was involved. The mentality of persons so varies that no particular degree of mental acumen is to be presumed as the measure of one's capacity to perform valid legal acts. The phrase is, at best, but an abstract statement of law. Since mental incapacity was not in issue under the evidence in this case, except in so far as it might be affected by undue influence, it was not error to strike the phrase from the instruction. The remaining portion of the instruction covered all that the jury needed to have been told on the point in issue. Under the circumstances of this case, the instruction without the amendment, might have confused or misled the jury.

■ Assignment of error number seven is without merit. The instruction refused, recited the presumption in favor of sanity in every man. The sanity of Mrs. Ferguson was never questioned in the pleadings or in the evidence, and the instruction had no application in the case.

■ The eighth assignment of error relates to the refusal of the court to admit certain evidence of the financial condition of the other children of the testatrix. There are, doubtless, cases in which such evidence is material. In this case, evidence practically the same as that objected to was

before the jury from other witnesses. Under the peculiar circumstances of this case, it is difficult to appreciate its materiality. If the mind of the testatrix was in the weakened condition alleged, and under the influence exerted over her, the financial situation of the respective parties could have had no bearing on the matter.

The last assignment of error deals with the refusal of the trial court to vacate and set aside the verdict of the jury as contrary to the law and the evidence. It, therefore, goes to the merit of the whole case, and, we think, involves the most material point therein. There is no doubt that there was a conflict in the evidence, but this conflict was submitted to the jury. The jury had a right to consider, where a chief beneficiary, in close relationship with a feeble and critically ill testatrix, urges the making of a will and dictates its provisions, that such circumstances engender suspicion and require an explanation. It has long been held that where the will appears to be more that of the person who draws it, urges its execution, and benefits from it, than that of the testatrix, who is weak and feeble, and has had no test made of her mental capacity, the whole proceeding is open to the suspicion that it was obtained by undue pressure. *Chappell* v. *Trent, supra; Riddell* v. *Johnson's Ex'r*, 26 Gratt. (67 Va.) 152; *Montague* v. *Allan's Ex'r*, 78 Va. 592, 49 Am. Rep. 384; *Fishburne* v. *Ferguson's Heirs, supra;* 28 R. C. L. 145.

There is evidence to show that while the testatrix was not mentally unsound, she was, by reason of her suffering and critical illness, in a much weakened physical condition and near death; that her physical weakness was such that she took little or no interest in what was going on around her; that she neither initiated the drawing of the will nor the provisions and terms thereof of her own volition and free agency; that, at the least, she never knew of some of its provisions and terms, nor the reason for any additions or omissions; and that she was so inactive in mind and body, induced by physical weakness, that she was unable to express her desires, if any she then possessed.

The evidence goes further to show that the son, who had lived in the home with her, initiated the drawing of the will; that without request of his mother, he secured the services of Dr. Quillen and J. G. Gray, to whom he told what was to be done and the provisions thereof; that except for the provision as to his half-brother and one dollar each to his two full brothers, he dictated all of the provisions of the will, including the gift to himself; that he directed and secured the signature of the testatrix by her mark when she was unable to sign her name; and that under the circumstances then existing, he was the directing genius of practically the entire proceeding and the chief beneficiary thereof.

Upon the issue *devisavit vel non,* the jury by its verdict, resolved the conflict in favor of the contestants of the will. Its verdict is entitled to the greatest weight. It concludes all mere questions of fact, depending upon the credit to be given to the witnesses. In addition, it has been upheld by the trial court, and under a rule long established, this court cannot interfere unless the jury's deviation from the proof is plain and palpable. *Jesse* v. *Parker's Adm'rs,* 6 Gratt. (47 Va.) 57, 52 Am. Dec. 102; *Lamberts* v. *Cooper's Ex'r,* 29 Gratt. (70 Va.) 61; *Hartman* v. *Strickler,* 82 Va. 225, 232; *Huff* v. *Welch,* 115 Va. 74, 78 S. E. 573; *Young* v. *Barner,* 27 Gratt. (68 Va.) 96; *Smith* v. *Ottley, supra; Culpeper* v. *Robie,* 155 Va. 64, 154 S. E. 687; *Redford* v. *Booker, supra.*

It appears from the record and the evidence that the parties have had a fair trial on the merits, and the judgment complained of will, therefore, be affirmed.

*Affirmed.*

HUDGINS, J., dissenting.

There are two views on the application of a statute reducing the time in which appeals may be perfected upon cases pending at the time the law takes effect. I thought

the application of such statutes in the absence of a saving clause in the act was settled by the opinion in *Allen* v. *Mottley Construction Co.*, 160 Va. 875, 170 S. E. 412, and cases therein cited. The other view is adopted by the majority opinion in the present case. While logical reasons may be advanced in support of either construction, it seems to me that having expressed approval of one view on a legal question which is susceptible of two interpretations, we should adhere to the one approved in the absence of some compelling reason to the contrary. On this point I dissent from the opinion of the majority.